IN THE MATTER OF PETITION FOR WRIT OF HABEAS CORPUS ON BEHALF OF KATHRYN ANNETTE WILLIAMS BY CHARLES C. WILLIAMS, PETITIONER, v. MARY GOSHORN WILLIAMS, RESPONDENT.— 205 S. W. 2d, 949.

Kansas City Court of Appeals. Opinion delivered November 10, 1947.

DEW, J.—Petitioner seeks by habeas corpus to obtain from respondent the custody of Kathryn Annette Williams, a minor child, eleven years of age.

Petitioner's first wife died in February, 1936, about three weeks after the birth of their said child, Kathryn Annette Williams. The following September, petitioner, then a student at the University of Kansas, married the respondent, also a student in that institution. The said infant child of the petitioner was placed in the care of her maternal grandparents for the following one and a half or two years. Thereafter she lived with the petitioner and respondent as the child of both, as was understood and orally agreed to by them before their marriage. In the course of time there was born to petitioner and respondent a child, Geoffrey Williams, now aged three years. While the family thus constituted was living in Oxford, Mississippi, petitioner and respondent were separated in June, 1947, and respondent moved to Kansas City with both of said children and they have since resided there in the home of respondent's widowed mother, Mrs. Goshorn. Petitioner is residing with his parents on a farm three miles from Lyons, Kansas. Petitioner demands custody of Kathryn Annette Williams on the ground that he is her sole, surviving parent, and respondent has refused that demand.

Respondent's return sets up an oral prenuptial agreement between her and the petitioner that the child Kathryn should be and remain in their household as their common child, and that respondent had since performed the duties and services of a natural mother to the child with the same affection as if it were her own. She also pleaded excessive drinking on the petitioner's part, cruelty to her and to the child, and that the petitioner was not fit to have the custody of the child. She asserted her financial ability to support and rear the child, and prayed the continued custody. Petitioner's reply denied the new matter alleged in the return.

According to the petitioner's evidence the petitioner, now thirty-five years of age, lived with the respondent as his wife in Lawrence, Kansas until his graduation in 1941, with a degree in Geology. While there respondent contributed to the purchase of their home out of her own separate income derived from an estate. Petitioner became employed in the United States Geological Survey, and has since increased his salary from $2000 to $4275 a year. They lived in Lawrence, Kansas until April, 1947, when they moved to Oxford, Mississippi, in connection with petitioner's employment. The Oxford home was purchased from the proceeds of the sale of the home at Lawrence. At the time of petitioner's marriage to respondent it was understood and agreed between them that petitioner's child Kathryn should in time be taken into their household "as our common child". During their residence in Lawrence the petitioner had

on occasions consumed intoxicating liquors to excess and the respondent had frequently taken drinks with him at such times. Petitioner lost no time from his employment by reason of his drinking. In 1940, respondent brought suit for divorce against petitioner while he was in the State of Oregon in the course of his employment, which suit was later dismissed. On New Year's Eve, 1938, he became intoxicated and the police were called, but no arrest was made. On another occasion in 1945, while driving on a highway of Jackson County, Missouri, with the respondent and Mrs. Goshorn and another, the petitioner stopped at some place on Wornall Road and petitioner was there arrested and becoming abusive, was beaten up by the police officers. One day in 1940, when petitioner was under the influence of liquor, he took Kathryn from the home of respondent's mother in Kansas City and "hitchhiked" with her to Lawrence, Kansas. On several occasions petitioner suggested to respondent that they both consult a psychiatrist for whatever help that might afford in adjusting their relations.

Petitioner testified that he has a great affection for Kathryn and she has a like affection for him. He has from time to time punished her for infractions, sometimes by slapping her, sometimes by using a switch or his belt. The respondent has punished Kathryn at times by slapping her.

Petitioner further testified that while living in Oxford, Mississippi he and respondent had frequent quarrels and on June 11, 1947, when both had been drinking, he made certain advances to her, whereupon she slapped him, and clawed and struck at him, whereupon he struck respondent and knocked her down twice. Local help was called in and his daughter Kathryn, at respondent's direction, telephoned respondent's mother at Kansas City to come down to Oxford. After two or three days of attempts at reconciliation, the petitioner left the home and went to the home of his parents at Lyons, Kansas. Respondent thereupon came to Kansas City with both children and moved in with respondent's mother. Thereafter the petitioner occasionally visited Kathryn and on occasions took her to places in Kansas City. Petitioner admitted that respondent entertained great affection for Kathryn and would make a good home for her if possible to do so; that respondent has separate means of her own, and lives in the home of her mother. Petitioner had frequently told respondent that in the event she divorced him he would demand the custody of Kathryn.

Petitioner testified that it is his purpose, if given custody of Kathryn, to put her in the home of his parents on their farm near Lyons, Kansas. The farm consists of 400 acres, and the home consists of a comparatively modern seven room house. There are good schools in Lyons, Kansas, and transportation to and from school would be furnished by petitioner or his parents, or neighbors. He has now

saved two or three thousand dollars, and has not indulged in intoxicating liquors since June, 1947.

The petitioner testified further that on all the occasions of intoxication mentioned, respondent drank with him, and frequently in the home of the respondent's mother. He denied having ever abused Kathryn at any time even when intoxicated. He stated that respondent had specialized in psychology while a student, and that her theories on that subject had suggested the discussion of psychiatry as a treatment for petitioner's condition of mind.

The testimony of the petitioner's father and mother disclosed that they had both been engaged in educational work during their adult lives at Lyons, Kansas, were in their midlle sixties, both of excellent character, culture and refinement, and now retired on their farm. Both manifested love and affection for Kathryn and their willingness to receive her into their household as a member of the family. They had never observed any drinking on the part of petitioner, nor the respondent, and knew little of the disruptions between them. They stated that no intoxicating liquors are kept in their home. Both stated that Kathryn had been happy whenever she was visiting at their home, and that there were neighbors about a mile away. She would have reasonable access to companionship with children of her age in Lyons.

A representative of the United States Geological Survey testified to the good record of the petitioner in his department, and as to his various promotions. He said the petitioner had not become intoxicated to his knowledge, and seemed to have a normal relation of a parent to his daughter. He said that respondent always seemed a good mother to Kathryn. A next door neighbor testified to like effect.

Kathryn was sworn and testified that she wished to continue to live with respondent, and did not wish to go to her paternal grandparents' farm; that she was happy where she was and did not want to be separated from her little brother. She said she had never known any mother except the respondent, who had always been good to her. She stated that petitioner had spanked her on occasions, and that while respondent was in the hospital on the occasion of the little boy's birth, petitioner whipped her with a rope because she declined to help him in the yard. She said he was not drinking at that time. She said she did not fear her father unless he was drinking. When her father was drinking, the respondent also drank, but not so much. She admitted that when visiting with her grandparents at Lyons she enjoyed her visits and met little girl friends in the town. She was asked: "And you love your father, do you?" "Well not as much as my mother". She described the quarrel between petitioner and respondent at Oxford, and said she had called Mrs. Goshorn by long distance "because

my father was hurting my mother, and I thought if she could come quickly why maybe she could help stop it''. She said her father was intoxicated at the time, but that respondent had been drinking also.

Another witness testified to preventing the petitioner, while intoxicated, from taking Kathryn from Mrs. Goshorn's home in Kansas City to Lawrence.

Mrs. Goshorn, mother of the respondent, testified that she is the widow of a lawyer of Kansas City, and that she owns the home where respondent and Kathryn are now living. She said that it contains four bedrooms, sleeping porch and breakfast room, and is thoroughly modern. She said she has sufficient estate to enable her financially to support respondent, who also has an interest in an estate left by Mr. Goshorn, including a checking account in a local bank. She stated that she would be happy to have Kathryn remain with them and to help rear her.

Respondent, now thirty years of age, testified to her education, financial condition, and present home situation as described by the former witnesses. She has a bachelor's degree and master's degree in psychology, and that after both children had become old enough she had assisted some in teaching that subject. She said that when she married petitioner she felt it was the duty of both to take Kathryn into the family as soon as practicable, and with her own means she purchased a home in Lawrence in 1942. The proceeds from the sale of this home paid for the home in Oxford, Mississippi, which she took in the name of both herself and petitioner. She described the altercation at Oxford in June, 1947. She said petitioner was drunk and asked for more liquor; that she threw her second drink into the sink. She said he made embarrassing demands of her in the presence of the children, and that she scratched him, whereupon petitioner struck her, knocking her down, later following her into the bedroom and again knocking her to the floor, bruising her jaw and mouth. She said petitioner threatened then to kidnap their boy Geoffrey, whereupon Kathryn picked up Geoffrey and ran outside and got into the automobile and locked the doors. Respondent soon followed and drove the family away and stayed about two hours. Not having any more money on her person she then returned home and found petitioner still drinking and very angry. He again hit her and broke her glasses. Respondent then called a local lawyer. When the lawyer arrived, petitioner went outside and hid. The lawyer then left, giving her the telephone number of the local police. At that juncture some friends dropped in on a social call and seeing the situation, stayed until midnight in order to keep company with the respondent. The mother arrived the next day and on June 11th petitioner left without saying where he was going. Later the

respondent came to Kansas City with her mother and the two children, and in about a week received a letter from petitioner.

Respondent told of the frequency of the petitioner's intoxications over the years since their marriage . She recounted the various arrests of the petitioner, and described an occasion in 1945 when he was found in someone's garage, and she was notified by the police that he was charged with house-breaking. She persuaded the prosecuting witnesses to dismiss the charges. She said since the death of the brother of petitioner that his drunkenness has increased. She said she had often threatened to leave him, and he would threaten to take Kathryn if she did so. She told of the filing of a suit for divorce in Lawrence, Kansas, which she later dismissed because of his promises to quit drinking.

Respondent further testified that she had had custody of Kathryn since the latter was three years old, and had always felt toward her like a mother. Their present home is very near a public school, where Kathryn is in the sixth grade. She has also been attending a nearby church. She stated that the girl has reached an age when it is especially advisable that she have the care and attention of a mother. She said that Kathryn is extremely fond of the child Geoffrey, her brother, and that despite the difference in their ages, they are most companionable. Respondent denied ever having been intoxicated, and said that the only drinking she had done was with her husband and then only moderately, and for the purpose of appeasing him. She explained her separation by stating that she had concluded that she was jeopardizing both children by continuing their relations, but that she had never filed another suit for divorce, although she intended to do so when proper residence requirements therefor had been completed. She said she had no present plans of remarriage. She said petitioner had frequently discussed a suggestion that he consult a psychiatrist, as he said he knew he was sick and needed some kind of treatment.

Respondent also testified that it was her intention to leave half of her property at her death to Kathryn, and the other half to the little boy; that she had already made similar provisions in a $10,000 life insurance policy. She said she regarded Kathryn as much her child as she did her boy Geoffrey. She related instances when the petitioner visited with the children since the separation, and stated that on such occasions both children would attempt to avoid meeting the petitioner. She denied encouraging this attitude on the part of the children, and asserted that she did all possible to allay any fear of their father on such occasions. She said she did not know whether petitioner had been intoxicated since the separation. She told of her intention to teach psychology two or three times a week during most of which time the boy would be in the nursery, and Kathryn at school. She further stated that

if she be given the custody of Kathryn it would be practicable and fair that petitioner be permitted to visit Kathryn at her home.

In proceedings such as this there is nothing that so appeals to the sympathetic side of the court, next to the paramount consideration of the best interest of the child, as does the natural yearning of a parent for his child's care, custody and society. It is an attribute of the highest quality in whomsoever it may abide. It is a noble instinct and should not be frustrated by man-made laws unless a still more exalted consideration demands it. This concept of the relation of child and parent has led to the well established rule of law that as against the world a parent has the primary right to the custody of his child, and that he is presumed to be fit and qualified for that natural privilege. Whosoever denies him this claim has the burden of proving his unfitness.

There is, however, in such proceedings to determine the proper custody of minor children, one consideration that preponderates all others, and that is the welfare of the child. That is the goal toward which the court must constantly steer its course in determining such an issue and must not vary therefrom by an effort to appease the claims of others, even of the parent. Of course, the welfare of the child is not to be determined solely by the physical aspects of one home or the other, or by mere financial considerations. Neither should the fact be ignored that normally the society and care of the parent is the natural right of the child, and ordinarily tends to promote its best interests and welfare. But such determination should, in a given case, be evolved out of consideration of all the existing facts and circumstances which affect the moral, physical and intellectual well-being of the child during its dependent years of minority. In the present case the petitioner is the natural father of the child whose custody he seeks. The respondent is not the child's natural mother, but her step-mother. No mere oral prenuptial agreement made by the petitioner to give to or vest in the respondent a valid claim to the legal custody of the petitioner's child as against his claim thereto could be binding on him. Weir v. Marley, 99 Mo. 484, 12 S. W. 798. The understanding of the parties so entered into before marriage is considered only as it may throw light on the attitude of the parties toward the child, and so far as such attitude may affect her best interest and welfare.

The evidence shows that throughout the marriage, to an increasing extent, except for the few weeks preceding this hearing, the petitioner has indulged in intoxicating liquors to excess; that he has many times become drunk, unmanageable and abusive; that on some of such occasions he has been arrested and has brought humiliation and disgrace upon his family; that he acknowledged his addiction to alcohol and seemed disposed to rely only on the possibility of cure by psychiatry or some such treatment rather than on any self-imposed

control; that, finally, while drunk, he violently beat and abused the respondent in the presence of his child Kathryn, and caused the final separation; that he has instilled in the daughter a fear of physical harm at his hands when he is intoxicated. A continuation of such indulgence by petitioner may reasonably terminate in loss of health, loss of employment, and consequent loss of ability to earn a living for himself and child.

The child Kathryn is presently living with respondent, the only mother she has ever known, who has admittedly cared for and attended her since the child's infancy. The child is in the sixth grade in a good public school located nearby, and attends a church in the near vicinity. It is admitted that respondent entertains for her deep and abiding affection, and that Kathryn returns that love and affection in kind. The home is presided over by respondent's mother; a lady of refinement and of comfortable means, who is anxious and willing to retain her daughter and family in the home. Respondent is educated and cultured, and has well looked after the educational, religious and physical welfare of Kathryn. There is also in the home the three year old brother of Kathryn, child of petitioner and respondent, with whom Kathryn is unusually companionable, and for whom she has a strong sisterly affection. Kathryn, now about eleven years of age, needs a mother's efficient and kindly care and supervision. She positively expresses a desire to stay and live with respondent, and does not wish to be taken to the grandparents' farm in Kansas for permanent residence.

Under the present circumstances in evidence it is our conclusion that it would be for the best interest and welfare of Kathryn that the respondent be awarded her custody, under the conditions prescribed below.

While Section 1659, R. S. Mo., 1939, may not apply in this case, the cause is, nevertheless, in the nature of an equitable proceeding, and we have authority to accompany the award of custody with such reasonable additional provisions touching the custody and control as, under the evidence, we deem proper. Ex parte DeCastro, Mo. App. 1011, 190 S. W. 2d 949. We believe that with all of the petitioner's shortcomings, the best interest and welfare of his child Kathryn will be promoted by an occasional association with her father, the petitioner, who still evidently entertains for her strong paternal affection.

The petition is denied, and the custody of Kathryn Annette Williams is hereby awarded to respondent. It is further ordered that the place of residence of said child shall at all times be made known to petitioner. Petitioner is hereby granted the privilege of visiting his said child Kathryn at her place of residence, or at some other place to be agreed upon by respondent and petitioner, such visits to be at convenient hours and not oftener than once a week, and shall be

at times as not to interfere with said child's education or health. Upon occasion of such visits petitioner shall be permitted, if he so desires, and if the health and educational requirements of the child permit, to take his said child to any proper place of entertainment or recreation as he may choose, returning the child during the same day to respondent at the latter's place of residence, or at such place as shall be designated by the respondent. At no time on the occasion of such visits shall petitioner permit himself to be or to become under the influence of intoxicating liquor. It is so ordered. *Cave, P. J.* concurs. *Bland, J.* not sitting.