246 S.W.2d 513 (1952)
COX
v.
CARAPELLA et ux.
No. 28401.
St. Louis Court of Appeals, Missouri.
February 19, 1952.
Fred J. L. Schuler and Leahy & Leahy, all of St. Louis, for petitioner.
John W. Barry, St. Louis, for respondents.
HOUSER, Commissioner.
This is an original proceeding in habeas corpus, tried by the full court. In her application *514 for the writ petitioner, Mrs. Jeanne Ward Cox, a resident of Jonesboro, Arkansas, alleged that Michael A. Carapella and Anita Carapella, residents of the City of St. Louis, unlawfully, illegally and wrongfully detain the infant daughter of petitioner, Pamela Sue Brown, born January 25, 1949 of the marriage between petitioner and Harry Brown; that Pamela Sue is forcibly detained by respondents over the objections of petitioner; that the detention of Pamela Sue is not authorized by the judgment, order or decree of any court or by any provision of law, and prayed for the issuance of the writ and that Pamela Sue be placed in petitioner's custody.
Respondents produced the child in open court and made return to the writ, alleging that 13 days prior to the birth of the child the petitioner agreed to permit the child when born to remain in the custody of respondents and later to be adopted by them, but that petitioner has never given her written consent, so that the child has not been adopted; that on January 25, 1949 Pamela Sue was delivered to the respondents by the petitioner and permitted to stay with them thereafter; that petitioner was married to a man other than the father of Pamela Sue; that after the birth of the child petitioner did not communicate with the child or with the respondents; that petitioner in July, 1949 stated that she did not want her friends and neighbors to know she had a child; that the child is suffering and has suffered for some time from diarrhea; that respondents placed the child in a hospital for 31 days under the care of a pediatrician; that on account of the child's physical condition her health will be greatly impaired unless given special nursing care; that petitioner has been married at least 3 times and has a child by her first marriage, a boy 4½ years of age; "and that said petitioner is not in a position to give said Pamela Sue Brown, also known as Pamela Sue Carapella, the care and attention said child's state of health now demands"; that respondents, residents of the City of St. Louis, are buying their own home and have 2 adopted children in the home and 2 other children left in their care by Catholic Charities of East St. Louis, Illinois. Respondents prayed that Pamela Sue Brown be remanded to their custody.
In her reply to the return petitioner alleged that respondents' custody of Pamela Sue was over her objections and entreaties and contrary to her repeated requests for the custody of the child; that Michael Carapella indulges in the use of intoxicating liquors to excess, has an ungovernable temper, is argumentative and quarrelsome; that respondents have threatened to do physical harm to Pamela Sue rather than return her to petitioner; that petitioner fears for the physical safety of her daughter; that respondents are not fit to be trusted with her custody; that she is now the wife of Ernest R. Cox who is in the Armed Services of the United States; that she and her husband plan to make their home together at Amarillo, Texas; that they are well able to support the child and that her present husband is willing and able to support the entire family; that petitioner is of good character and physically, morally, mentally and financially ready, willing and able to give Pamela Sue the proper care and attention; that respondents are overburdened with children; that their home is extremely overcrowded and that there is a constant state of uproar in the home by reason of their excitable natures, all of which tend to damage and injure the health, sense of security and well being of Pamela Sue.
At the outset of the trial respondents admitted that petitioner is the natural mother of the child and that they do not hold the child by virtue of any adoption decree or other court judgment or order. Both by the law of nature and by the statutes, RSMo 1949 § 457.020, V.A.M.S., and decisions of this state, parents are the natural guardians of their minor children, have the primary right as against all the world to their custody, and are presumed to be fit and qualified for that natural privilege. Williams v. Williams, 240 Mo.App. 336, 205 S.W.2d 949. The natural right of a parent to the custody of a minor child should never be denied unless it is made manifest to the court that the parent for *515 some strong and cogent reason is unfit or incompetent to take charge of the child, or unless the welfare of the child itself, for some special or extraordinary reason, demands a different disposition of the child at the hands of the court. Ex parte De Castro, 238 Mo.App. 1011, 190 S.W.2d 949, loc. cit. 959; Daugherty v. Nelson, Mo. App., 234 S.W.2d 353, loc. cit. 365.
Having raised the question of the fitness of petitioner to act as custodian of Pamela Sue as an affirmative defense, respondents had the burden of proof on the issue of her fitness. Williams v. Williams, supra. In their effort to discharge that burden respondents undertook to show that petitioner has had a varied, checkered and unstable marital history; that during her first and second marriages petitioner led an immoral life; that before the birth of Pamela Sue she tried to destroy the child; that the birth of Pamela Sue was under strange and unusual circumstances; that petitioner has taken no interest in Pamela Sue since her birth and has had no real interest in Scott Thomas Abell, aged 5, the child of her first marriage; that she is in reduced financial circumstances and unable to properly care for the child; and that the condition of the child's health requires that she remain in the Carapella home, where her physical condition is best understood.
The following facts were testified to by petitioner, who was placed on the stand by respondents: Petitioner is now 24 years of age. She lives in Jonesboro, Arkansas. She married James P. Abell at West Memphis, Arkansas on November 16, 1945 at the age of 18 and lived with him 3 or 4 months. A son, Scott, was born August 11, 1946. An Arkansas court, acting on her petition, granted her a divorce from Abell on May 20, 1948 and awarded her custody of Scott. She married Harry A. Brown on June 3, 1948. Petitioner and Brown separated 4 or 5 months later. He failed to support her. Although Brown knew petitioner was in the family way he made no financial arrangements for the birth of the child. She was in desperate financial circumstances at that time. At the suggestion of respondent Anita Carapella, who is petitioner's great-aunt, petitioner agreed that she would come to St. Louis, stay at the Carapella home and have the baby in a local hospital under the name of the Carapellas. Mrs. Carapella wanted the baby. Mrs. Carapella made arrangements for petitioner to enter the hospital and arranged for the doctor. At the suggestion of Mrs. Carapella petitioner, instead of giving her true name, of Jeanne Brown, wife of Harry A. Brown, a resident of Arkansas, gave her name as Anita Carapella, her husband's name as Michael A. Carapella, and her address as 2809 Semple Avenue, St. Louis, Missouri. When the child was born January 25, 1949 she named the child Pamela Sue Carapella and told the authorities at the hospital that the father of the child was Michael Carapella. Petitioner stayed at Mrs. Carapella's home a week or two before entering the hospital and for 10 days after returning from the hospital. She returned to Arkansas without the baby, and told her husband and others that the child had died. The next time petitioner saw the baby was on July 4, 1949, at which time Mrs. Carapella brought the baby to Arkansas for a visit. At that time petitioner made no effort to take Pamela Sue away from the Carapellas either physically or by the employment of counsel and the institution of a lawsuit. Petitioner worked for the City of Jonesboro from June, 1949 through July, 1950 and at Lowensteins in Memphis, Tennessee as a secretary from October, 1950 through June, 1951. While she was working in Memphis she lived at a boarding house with several girls; that she had dates with service men and would go dancing with them at various hotels and at the YMCA; that these young men customarily came up to the rooms of the girls to meet them; that at a USO party some 6 or 8 months before the month of June, 1951 petitioner met Ernest Cox, then a private in the army; that at that time he was stationed in Cheyenne, Wyoming and was going through Memphis on his way to Birmingham; that thereafter by correspondence they came to an agreement to marry. Between the time she met Cox and *516 June 4, 1951 petitioner did not see Cox but merely corresponded with him. On June 4, 1951 Cox arrived in Jonesboro. He took petitioner in an automobile to the home of her husband, Harry Brown, where she procured from Brown an entry of appearance in a divorce case in which petitioner was plaintiff; that on June 5, 1951 she filed the petition for divorce, the hearing was held, and she was granted a divorce from Harry A. Brown; that on June 6, 1951 she married Ernest Cox. After a brief honeymoon in Memphis some 3 or 4 days after the marriage Cox, who had a 10-day leave, returned to his army base. Since that time petitioner has seen Cox several times at Jonesboro, Arkansas. Cox has visited there during two 10-day leaves and on several week-end leaves averaging once every 6 weeks.
Mrs. Carapella testified that petitioner "gave" the child to her; that petitioner did not want the baby; that when she went to Jonesboro in July, 1949 petitioner told her "it didn't seem like her baby" but it seemed like it was a part of Mrs. Carapella; that petitioner called the child "frog eyes"; that petitioner feared lest some one recognize the baby as hers and stated she did not want anyone to know she had a baby; that petitioner had never asked for the child until the filing of this lawsuit. This was denied by petitioner. Mrs. Carapella denied having any telephone conversations with petitioner after the latter went home following the birth of the child and stated she had received no letters from her. Mrs. Carapella testified that petitioner told her that she had tried to destroy the child twice; that petitioner's mother and stepfather helped her in her effort to get rid of the baby; that one night petitioner drank cups of hot gin until she made herself sick. This was denied by petitioner. Mrs. Carapella denied that she had threatened to leave town if petitioner tried to see the child. Mrs. Carapella further testified that at the age of 11 months Pamela Sue had a severe virus infection, diarrhea, 5 blood transfusions and that she had 3 doctors and spent 31 days at the hospital; that the doctors gave her up twice; that a hospital bill of more than $500 and other bills totaling more than $85 in addition to doctors' bills were incurred and paid by the Carapellas; that the child's kidneys were dehydrated and that she needs lots of liquids, should eat no sweets, no candies, there are "just little things I can do"; that the child has skin trouble which comes and goes, apparently an allergy condition brought on by heat and expressed her desire to keep the baby and bring it up with the rest of her family, which consists at this time of her husband, Pamela Sue and 2 adopted and 2 foster children.
Even though it should be established that petitioner entered into an agreement and consented that the child remain with the Carapellas, such an agreement of course would not be binding on petitioner, nor would it prevent her from recovering the custody of the child if she was otherwise entitled to custody. Weir v. Marley, 99 Mo. 484, 12 S.W. 798, 6 L.R.A. 672.
By what standard shall we weigh and measure the fitness and suitability of petitioner to have the custody of her child? The policy of the State of Missouri has been declared where the effort is to divest the parent of the custody of his or her child. For instance, in an adoption proceeding where the parent has not given written consent the dereliction of the parent in the discharge of his parental duties which will authorize the court to decree to another the custody of the child is wilful abandonment or wilful neglect to provide the child with proper care and maintenance for the space of a year. RSMo 1949 § 453.040, V.A.M.S. And where the effort is to suspend the rights of the parents of homeless, dependent, neglected or ill-treated children and commit them to the guardianship of the department of public health and welfare the test is whether the child is "dependent upon the public for support, or in a state of habitual vagrancy or mendicity or is ill-treated, and (whether) * * * his or her life, health or morals are endangered by continued cruel treatment, neglect, immorality, or gross misconduct of its parents * * *." RSMo 1949 § 210.120, V.A.M.S. (Parentheses ours). Similarly, where the state proceeds to take *517 a child from the custody or control of its parents to be dealt with under the provisions of the law applicable to neglected children, the test is whether the child is "destitute or homeless, or abandoned, or dependent upon the public for support, or who habitually begs or receives alms, is found living in any house of ill-fame, or with any vicious or disreputable person, or who is suffering from the cruelty or depravity of its parents". RSMo 1949 §§ 211.010(2), 211.310(2), V.A.M.S.
In a habeas corpus proceeding between a natural parent seeking to obtain custody of his child and strangers who hold the child without the sanction of any judicial decree, the fitness, competence and suitability of the parent to take charge of the child, when challenged, is to be measured by the same standards, supra, by which the determination is made whether a parent has forfeited his right to the continued custody of his child.
The immediate question, therefore, is whether petitioner is guilty of wilful abandonment and wilful neglect to provide this child with proper care and maintenance; whether from the evidence it is shown that the child, if placed in her custody, would become homeless, or dependent upon the public for support or reduced to a state of habitual vagrancy or mendacity, or ill-treated, or that her life, health or morals would be endangered by continued cruel treatment, neglect, immorality, or gross misconduct on the part of this petitioner; or from depravity on her part.
A much stronger case would be required than that presented by the evidence in this case to warrant this court in finding the petitioner unfit and unsuitable when meausred by these standards. In the first place, it must be remembered that the parent's right to custody of his child must be determined with respect to existing conditions and that evidence of past conditions is material only to the extent that it clarifies and casts light on existing conditions. Ex parte De Castro, supra. As that rule applies to this case, there is not a word of testimony tending to impeach the character of petitioner or to detract from the evidence of good conduct on her part since her marriage to Ernest Cox on June 6, 1951. The evidence is that since that time she has lived at home with her mother in Jonesboro, Arkansas, attending to her child Scott, cooking and keeping house for her mother, brother, sister and son; that she is conducting herself in a clean and moral manner; that she does not run around with men; that she never leaves the house, even with girl friends; that she "is right there with Scottie all day"; that she does not drink intoxicants; that her reputation in Jonesboro, Arkansas for truth, veracity and morality is good and that she wants Pamela Sue very much so that she can be reunited with her children.
We are convinced that at this time petitioner, judged by the standards which control this type of case, is a fit and suitable person to take the custody of her daughter Pamela Sue; that she has a strong and natural desire to be reunited with the child and that she is genuinely interested in promoting the welfare of the child.
We find no wilful abandonment or wilful neglect to provide care and maintenance. While it is true that petitioner left Pamela Sue with respondents shortly after the birth of the child, this was scarcely abandonment in view of the pitiful plight in which petitioner then found herself, estranged as she was from her husband, in desperate financial straits, in a city far distant from her home, under circumstances where her great-aunt was encouraging her and her mother was acquiescing in the plan to leave the child with the Carapellas. If her leaving the child in the physical custody of the Carapellas at the time is to be regarded as voluntary, its character in that respect quickly changed for we find that petitioner wanted the baby turned over to her when the baby was 2 weeks old; that at that time Mrs. Carapella told petitioner she could not have the baby; that Mrs. Carapella told petitioner that the latter could not prove that Pamela Sue was hers; that petitioner at no time told Mrs. Carapella that the baby "was hers" (Mrs. Carapella's); that petitioner demanded the baby from the Carapellas when the child was 6 weeks old; that petitioner typed a *518 letter to the attending physician on August 8, 1949 which was signed by her mother, invoking the assistance of the doctor in recovering the baby; that petitioner made several long distance telephone calls and wrote one or two letters to Mrs. Carapella telling her that she "wanted the baby"; that all such efforts to regain custody of the child were rebuffed; that Mrs. Carapella warned petitioner that if she tried to take Pamela Sue from the Carapellas or "started anything" the latter could go to New York, California or anywhere else and petitioner would never see the child again; that Michael Carapella's business was such that he could leave at any time; and that Michael Carapella in September, 1949 threatened that he would kill Pamela Sue, the 2 adopted children and himself before he would "give her up"; that petitioner made no effort to see the child because she felt the Carapellas would leave with the child if she did so.
There was no "failure to support". Petitioner testified that she had offered to pay the Carapellas money to support the child but that Mrs. Carapella "refused to take any", saying that she "did not need any help for the child."
That petitioner is competent to care for children is attested by the very appearance of her first child Scottie, who was present for hours and even days during the taking of testimony in this court. This young boy gave every appearance of being a child who is well adjusted, mannerly and well disciplined. He looks healthy, well groomed and well cared for. It is in evidence that he has never been sick a day in his life. It is difficult, indeed impossible, for us to believe that Scottie has been ill-treated or that his life, health or morals have been "endangered" by ill treatment, neglect, immorality, gross misconduct or depravity on the part of his mother, or that Pamela Sue would be so treated.
The charges of immorality leveled against petitioner were not sustained by substantial, credible evidence. We reject the hearsay testimony related by James P. Abell, petitioner's first husband, implying misconduct on her part. We note that Abell was not sufficiently impressed with the truth or gravity of these charges to relate them to the trial judge when petitioner sued Abell for divorce. Nor is there substantial evidence of misconduct on the part of petitioner while she lived in Memphis. This evidence relates to a period of her life that is past and remote. The evidence itself is conjectural and speculative. We believe petitioner's statement that she did nothing wrong on the occasions mentioned. Furthermore, petitioner has two solemn decrees from the courts of the state of her residence adjudicating that she was innocent of any breach of marital obligation during this period.
Respondents introduced in evidence a letter dated April 4, 1949 written by Bonnie Ward, petitioner's mother, to Anita Carapella in which Mrs. Ward indicated that Jeanne was unconcerned about the child. Mrs. Ward testified at the hearing, explaining her reference to petitioner's indifference in this way: that Jeanne did not act too interested in Pamela Sue because of her financial condition and because of her nature; that she is a quiet kind of a girl and "just isn't the kind to make much over children at all." Denying that petitioner was indifferent, Mrs. Ward said that petitioner is "just of a quiet turn", and testified that Jeanne wants the child "very badly."
The hearings in this cause were commenced on the 14th of December. Because of the necessity of obtaining evidence in Arkansas and Tennessee by way of depositions it became necessary to hold later hearings in the case and the cause was not finally submitted until January 31. At all times during the progress of the litigation and until the last day of the hearings it appeared that petitioner's husband, Corporal Cox, wanted to be reunited with petitioner, wanted to make a home for both of her children, and was interested in the progress of the case. On the last day of the hearings, however, a letter from Corporal Cox addressed to one of the respondents' lawyers was introduced in evidence in which he indicated that he has no intention of providing a home for his wife or her 2 children; that he is filing a suit for divorce from her; that she is not a fit person to have the child and that he is washing his *519 hands of the whole affair. His complete change of heart comes so recently that there is some cause to believe, as petitioner contends, that the striking change in his attitude has been the result of some recent influence, although respondents stoutly deny that they have been in touch with Corporal Cox. In any event we do not attach such significance to this new development as to require us to deny the petitioner's claims.
In those instances in which the testimony of Anita Carapella conflicts with that of petitioner, as where the former affirmed and the latter denied that petitioner tried to destroy her child; that petitioner "gave" the baby to Anita Carapella; that petitioner expressed indifference concerning the child; that petitioner did not request the return of Pamela Sue, etc., we resolve the conflict in favor of the petitioner.
We do not find in the record any "special or extraordinary reason" demanding that the child remain with respondents. It is true that the respondents are possessed of more worldly goods than petitioner. They own a substantial 6-room, well furnished home, a 1951 Chevrolet passenger automobile and a truck, some bonds and a bank account. They supply the children in their home with "everything in the way of toys." Mr. Carapella has a good position, earning $120 a week plus overtime and substantial bonuses. The best interests of a child, however, are not to be determined solely by the physical aspects of the home, Williams v. Williams, supra, by mere financial considerations, Ex parte Archer, Mo. App., 253 S.W. 1095, or by material benefits, State ex rel. Crockett v. Ellison, 271 Mo. 416, 196 S.W. 1140, 1141.
Petitioner has heretofore demonstrated her ability to earn a living, has a suitable home with her mother where the child is welcome, and we are satisfied that petitioner can and will adequately provide for this child.
There is nothing in the evidence to show that the special dietary requirements of this child and its other health needs cannot be provided as well by petitioner as by respondents.
In making our decision we are not unmindful of the fact that Mrs. Carapella deserves the everlasting gratitude of this petitioner. She has given Pamela Sue every advantage at her command. The payment by the Carapellas of all of the hospital and medical bills attendant on the birth of the child, except for $100 advanced by petitioner and her mother, the subsequent incurring of a hospital and medical bill in excess of $500 when the child was besieged with a severe virus infection, together with the constant concern which Mrs. Carapella has exhibited for this child, convince us that the interest of Mrs. Carapella in the welfare of the child is genuine and commendable. No matter how tender and solicitous another may be toward a child, however, there is no substitute for a mother's love. The natural bonds of affection and the protective instinct implanted by the Creator in the heart and soul of a mother entitled that one whose very blood runs in the veins of her child to first consideration when as between her and strangers the physical custody of the child is to be determined.
Respondents not having sustained the burden of proving that petitioner is unfit and unsuitable to enjoy her natural privilege of the custody of her child, and no special or extraordinary reasons affecting the welfare of the child appearing to demand a different disposition, judgment should go for the petitioner and an order should be made commanding respondents to discharge Pamela Sue Carapella forthwith from their custody, and directing that the child be placed in the custody of the petitioner. The Commissioner so recommends.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the court and pursuant thereto respondents are commanded to discharge Pamela Sue Carapella from their custody and to surrender her forthwith to the marshal of this court, who shall thereupon place her in the custody of the petitioner.
BENNICK, P. J., and ANDERSON and RUDDY, JJ., concur.