In the Matter of Terry Rae SHEPLER and Kevin Lee Shepler, Minors.

Edward R. SHEPLER, Petitioner,

v.

Otis Terrill SAYRES and Lorena Sayres, his wife, Respondents.

No. 31373.

St. Louis Court of Appeals.

Missouri.

Oct. 31, 1962.

Motion for Rehearing or to Transfer to Supreme Court Denied Nov. 20, 1962.

J. Andy Zenge, Jr., and Richard R. Howe, Canton, for petitioner.

Brown & Normile, Edina, for respondents.

BRADY, Commissioner.

This is a proceeding in habeas corpus instituted in this court by Edward R. Shepler, hereinafter referred to as the petitioner, natural father of Terry Rae Shepler, age 11, and Kevin Lee Shepler, age 7, to obtain their custody from Otis and Lorena Sayres, hereinafter referred to as the respondents, the children's maternal grandparents with whom the children have been living since the death of their mother.

The deceased mother of these children was divorced from the petitioner in 1955 and by the decree was awarded custody of the children and $100.00 per month for their support. On July 24, 1960, the mother, Melba Shepler, drowned. The facts concerning the first attempt by the petitioner

to get custody of these children since that unfortunate occurrence, and the attempts by the maternal grandparents directed to the same end are related in Shepler v. Shepler, Mo.App., 348 S.W.2d 607. The next step taken by the petitioner was to file his application for a writ of habeas corpus in the circuit court of Knox County. Upon the return being filed, a hearing was held with the result that the petitioner's application was denied. The petitioner then filed his application for a writ of habeas corpus before this court, alleging: (1) his parenthood and the death of the children's mother; (2) that the respondents " * * * have held the children over the protest of petitioner since the death of their mother as aforesaid * * * " and are now doing so; (3) that this restraint by the respondents is illegal, the petitioner as natural father being " * * * the only person having legal right to the care, custody and control of said minor children"; and (4) that the petitioner had made no previous application to this court or to the Supreme Court for the relief sought herein.

The return admitted the petitioner was the father of the children, the death of their daughter, the children's mother, and that the children have lived with them since the mother's death, but denied the other allegations as to restraint or the illegality of the children so residing, and that no other application had been made to this court or to the Supreme Court. The respondents also alleged that they were awarded custody of these children as a result of the judgment of the circuit court of Knox County denying the petitioner a writ of habeas corpus. The return then alleges that:

" * * * since the date of the divorce mentioned above, the petitioner failed and refused to pay to the deceased Melba E. Shepler the child support awarded to her by the court, and still refuses to assist in the support of these children to any material extent, the sole extent of his support being in infrequent gifts of toys and clothing;

* * * that the petitioner has abandoned said children and has not seen them for a period of about one year and prior to that time had not even seen them for several years; that the children in question are happy, content and in a good state of health and a move to a strange environment to live with people who are strangers to them would have an adverse affect (sic) on the mental health and physical well-being of these infant children; * * * that the petitioner has demonstrated his contempt for the Honorable Courts of the State of Missouri, and the orders and judgments of said Courts, by failing and refusing to obey the orders of said Courts in that he completely failed and refused to pay the child support awarded by the Circuit Court of Scotland County, Missouri to the mother of the minor children and has failed and refused to pay the costs taxed against him by order of the Circuit Court of Knox County, Missouri in the Habeas Corpus hearing held August 22, 1961; that to grant the relief prayed for by the petitioner would adversely affect the life, education and welfare of these children."

The return then alleges, "That for all of the reasons aforesaid, Edward L. Shepler is not a fit person to have the custody of said minors and it would be to the best interest of said minors that the custody be awarded to * * * " respondents.

When the instant application was submitted to this court, the parties stipulated that the testimony taken in the Knox County application for habeas corpus would be the evidence, and no further testimony would be offered. This court permitted that procedure subject to our ruling that if the transcript failed to disclose sufficient facts upon which we could arrive at a conclusion as to the father's fitness we would then order a further hearing.

There were many other allegations in the return which under our decision herein be-

come pertinent only if this court should find the petitioner unfit. Since we do not so find the petitioner, the allegations in the return dealing with the commendable actions of the Sayres in taking care of these children since the mother's death, those going to the financial condition of the Sayres and their good character, those dealing with the children's present well being and scholastic achievements, and those allegations of the return dealing with the present happy environmental adjustment made by the children and the evidence supporting such allegations will not be stated.

■ Another preliminary matter that should be disposed of prior to a consideration of the evidence is the contention of the Sayres that we are not to reverse the findings and ruling of the circuit court of Knox County unless we find them " * * * in conflict with a clear preponderance of the evidence so as to disclose a manifest abuse of judicial discretion" as he states it. This is not the law. The prior determination by the Circuit Court of Knox County of the same issues here presented to this court does not so affect the right of the petitioner, whose application was refused in the circuit court, to bring to us his application for the writ, Ex parte Archer, Mo.App., 253 S.W. 1095 at [2] page 1096; Ex parte Lofts, Mo. App., 222 S.W.2d 101. The matter is not one of appeal, In re Waller, Mo.App., 234 S.W. 866, and we are not bound by the limitation of review urged by counsel for respondent.

The facts are rather sketchily developed with respect to chronological order, but a careful reading of the transcript indicates that with respect to petitioner's financial condition, petitioner first worked in Des Moines, Iowa, in 1952, at a chemical company, then became a machinist and then a tavern operator. It does not appear whether these latter employments were prior or subsequent to his divorce from the deceased mother of these children in 1955. In any event, very shortly after his divorce, petitioner married one Ruth Williams who owned and operated two taverns in Des Moines. According to petitioner, they had a good deal of marital difficulty and were divorced in 1956. In connection with his marriage to Ruth Williams, the Sayres attempted to show that the petitioner had been arrested on a charge of attempted murder and robbery and that his then wife, one Ruth Williams, was the complaining witness. Upon objection that the charge was later dismissed, the trial court refused to allow the Sayres to develop the matter, and an offer of proof as to the arrest was then made and refused. The petitioner first went into the aluminum siding business in 1956 when the tavern failed and began as a " * * * helper, or trainee, for an aluminum siding company, learning the business * * *", that he worked at that job, traveling through North Dakota and South Dakota and Minnesota and Michigan, and when the weather got colder through Indiana, Kentucky, West Virginia and the Carolinas; that he would work three weeks, with a week off, and got paid by the square of siding he applied; that he pursued this work for about two years and then went to work for Farm and Home Builders—where is not stated, but the inference is in Kirksville, Missouri—on a commission basis, making " * * * Just enough to get by on, and own a car to do the job, and that's about it"; that he is now a partner in the Southwestern Improvement Company in Phoenix, Arizona, and is engaged in selling and installing " * * * aluminum siding, and we have patios, etc. * * *"; that in this business he is in charge of construction, his partners who sell and workers in the sales and construction end of the business; that he lives on what he makes out of the construction end of the business as an applicator of this siding and his partners live out of their sales commissions, leaving whatever profit to build up the business; that he had been making around $1,000.00 a month for about six months prior to this hearing on August 22, 1961; and that he also owns some first mortgages on real estate which were given to the company to pay for the

services and materials of the company. It is not necessary to go into all the testimony regarding petitioner's income. It will suffice to state that the respondent contended that the discrepancies in his statements as to his income and the income indicated by his net after deductions and exemptions " * * * clearly goes to the weight that must be given to this man's testimony, and also goes to his ability to support his children." The petitioner stated that he did not remember specific amounts deducted for business expenses or for charities or churches, since he turned all those matters, with his receipts, cancelled checks and similar evidence over to " * * * the man who makes it out for me * * *." Copies of his income tax returns for 1959, 1960 and 1961 were filed as exhibits. They show an adjusted gross income in 1959 of $2,794.89 on a total income of $10,090.75, the difference, of course, being business expenses. For 1960, the adjusted gross was $4,839.96, and the total income was $13,523.22. Also on file was a copy of the 1961 return, showing a total income of $12,040.53, on which the adjusted gross was $5,950.19, and also additional net income of $4,007.81 for a total of $9,958.00. After deductions and exemptions, petitioner had a taxable income of $7,762.20 for that year. The petitioner further testified that he pays $100.00 a month rent on his apartment, $150.00 a month on his automobile, and estimated that he would have to set aside about $75.00 a month for federal income taxes; that the present monthly amount spent on recreation is $20.00 or $25.00; that he has no life insurance; that his car insurance is included in his payments; that he doesn't know what he gives monthly to churches and charities; that he gives his wife $25.00 or $30.00 a week for groceries; that he pays $50.00 a month on his furniture which will be paid for in two more months; that his wife has a car given to her by her father, and they use this car for personal matters and his car for his business. The petitioner stated that he would take care of his children and " * * * could work nights if I had to. I hope I can"; that

whatever it takes to support them he would get and that " * * * I will either sell the car and use one car or I will do something else. Now, I also get ten per cent net of the business at the end of '61. I'll tell you what that is after the end of this year. It could be five or six thousand dollars. I don't know, but I'll file on that this coming year. But that's ten per cent of the net profit of the business that I have never gotten yet, but it should be this time."

With respect to other issues the petitioner's testimony was that his present apartment in Phoenix consisted of two bedrooms, kitchen, bath and living room which he thought of sufficient size should the children be placed with him. He had moved to this apartment because it had a swimming pool and a big playground and lawn and was air-conditioned and he could get a three bedroom one for only slightly more, about five dollars a month more, and even less than he was now paying if it was merely air-cooled instead of air-conditioned. He also testified that the school was only two or three blocks from the apartment and he intends to see that the children go to school and finish high school; that the apartment is also just two or three blocks from the church his wife regularly attends, although he is not a member of any church having attended only four or five times in the year before his testimony, and that he would see to the children's regular Sunday School attendance. He gave his age as 36, and the age of his wife, a native of Iowa, as 26 years old. His wife had never been married before and was not working.

When questioned about his failure to pay the support money ordered by the divorce court, his testimony was that he paid the $100.00 support decreed by the divorce court for four or five months until " * * * I had a business failure and so forth up there, and I didn't have it to pay" but he had helped some through " * * * gifts and Christmas and so forth * * *" and that his sisters and mother had helped the children continually. His further testimony on this issue was that he started making this amount per

month in November of 1959 and when asked if he had enough left out of it to pay the child support called for in the divorce decree stated, "Well I suppose I could have * * * I didn't. That's right. But they were taken care of, though." When asked why he hadn't paid this support award in the past, petitioner's testimony was:

"* * * When you can't, you can't. I made one mistake and I'm trying to get straightened out and I am getting straightened out, and I can take care of them, and I'm young and I can take care of them and get them through school, and I don't know as they can where they are now. Neither one of their boys went to high school, they quit in the 8th grade, and I went through high school, and my kids are going through high school if I can have anything to do about it. * * *"

Questioned about not coming to see the children, petitioner stated that while he lived nearby he came to see the children as often as he could until the deceased mother asked him to stay away; that this was "* * * Sometimes every month, sometimes six months, maybe once a week * *"; that the children were then in Kirksville or at his sister's, although it is not stated with whom they were in Kirksville, or where his sister lived; that prior to July 24, 1960 he last saw the children on July 4, 1959, that while he was working for Farm and Home Builders in Kirksville in the summer of 1959, he saw them "* * * every night for a week or so * * *". Other testimony on this issue comes from Mrs. Sayres, who testified in a deposition held after the hearing before this court and filed in this proceeding by agreement of the parties and with our leave that she was familiar with the petitioner's handwriting; that to her knowledge the children have never received letters from the petitioner since their mother's death; and that they had received some cards written to them in care of the Sayres. Exhibits 2 and 3 were birthday cards, signed "Daddy and Millie", Exhibit 4 was a Valentine for the boy, and Exhibit 5 was a Valentine for the girl which were signed in the same way. Exhibits 6 and 7 were Easter cards for each of the children signed "With love, Daddy and Millie." There was also a short note on the back of these cards which told of an Easter package on the way, of "western clothes" having been sent to each for their birthday and of the receipt of a picture from the children. In addition to these cards, Mrs. Sayres testified that there were Christmas cards also; that the signatures on the Exhibits 2 through 5 were not in the petitioner's handwriting and neither was the note on Exhibits 6 and 7, but that on the last two cards there was some printing, "I love you, Daddy" and she could not say whose it was. None of the Exhibits 2 through 7 was dated. The witness further testified that the children received money from the petitioner on Easter, $2.50 the last Easter, and $1.50 before that; that except for this money the petitioner had not contributed any money since July, 1960, but did send clothing: "Q. On how many occasions? A. Oh, on birthdays and Christmas"; that this clothing consisted of "* * jeans and 'T' shirts and skirts and blouse; and each one of them, a riding outfit * * *"; that she did not know of any telephone calls to the children from the petitioner; and that since July, 1960, the children had visited the petitioner's sister in her home where the gifts of clothing previously mentioned were delivered. On cross-examination, Mrs. Sayres testified she had never written to the petitioner about the children and the only thing she had done was to have the children send the petitioner their school pictures in 1961.

The other testimony offered by the petitioner was that of his wife and as offered by the respondents was that of neighbors and friends of the Sayres, their daughter-in-law, and the children's school teacher. All of this testimony goes to matters other than the issue of the petitioner's fitness.

It is true that as the rule of law applicable to proceedings of this nature is sometimes stated, the wording thereof might reasonably lead to the conclusion that the parental

right is supreme in and of itself. Examples of such wording are to be found in cases which recite the rule in the following or similar fashion: It is the duty of the court to award the person of the infant to the custody of the parent, unless it is made manifest to the court that the parent, for some reason, is unfit or incompetent to have custody or unless the welfare of the child itself, for some special or extraordinary reason, demands this disposition be made. In the Matter of S and L, Mo.App., 306 S.W.2d 638; In re Wakefield, 365 Mo. 415, 283 S.W. 2d 467; In the Matter of Scarritt, (1882) 76 Mo. 565 at loc. cit. 582; In re Richardet, Mo.App., 280 S.W.2d 466; Ex parte De Castro, 238 Mo.App. 1011, 190 S.W.2d 949 at loc. cit. [13] page 959. It is likewise true that other statements of the rule just as reasonably lead to the conclusion that all that must be done is for the court, as the respondents' counsel states it, to "* * * place on a scale the welfare of these young children and if the scale tips in favor of awarding custody to the maternal grandparents * * *" then the writ must be denied. An example is the language of the court in Testerman v. Frederich, Mo.App., 323 S.W.2d 522 at [2] page 525:

"We recognize the rule of law that a natural parent has the primary right to the custody of his children. But we also recognize that in determining the issue of custody, the one consideration that preponderates all others is the welfare of the children. * * *

"It is our conclusion that the welfare of the children will be best served by denying the petition * * *."

However, a careful reading of Testerman, supra, will disclose that in fact the court actually found, although the wording was couched in terms of the welfare of the children, that the father was unfit.

A correct statement of the rule to be applied in these cases is one that recognizes the presumption which courts find arises from the relation of parenthood. Thus, in

Ex parte Archer, Mo.App., 253 S.W. 1095, a habeas corpus proceeding brought by a father to obtain the custody of his eleven-month-old son alleged to be unlawfully restrained by the maternal grandmother, the court at [3–5], page 1096, of 253 S.W., stated:

"We next come to the proposition of the welfare of the child. The law seems to be well settled that the primal consideration of courts in cases of this character is the welfare of the child. It is also equally well settled that the presumption is that the best welfare of the child is to be with its parents. See Orey v. Moller, 142 Mo.App. 579, 121 S.W. 1102; In re Boutelle, 124 Mo.App. 450, 101 S.W. 1096. To overcome this presumption, those seeking to deprive the parent of the child must make a strong showing that the parent is an unfit person to have the child, and in the absence of such showing the presumption should and does prevail."

In the case of In the Matter of Cole, Mo. App., 274 S.W.2d 601, a habeas corpus proceeding brought by a mother to obtain custody of her children, allegedly restrained by their stepmother, the divorced father to whom custody had been awarded having died, this court at syllabus [1–4] page 608, of 274 S.W.2d held that:

"* * * By his death the natural right of petitioner as mother and surviving parent was revived and she became entitled to the custody of her children as against respondent, whose actual custody was without legal sanction, if and providing petitioner is a fit and suitable person. State ex rel. Walker v. Crouse, 240 Mo.App. 389, 205 S.W.2d 749. Parents as the natural guardians of their minor children are presumed to be fit and qualified to assume the custody of their children and the natural right of the parent should never be denied unless it is made manifest to the court that he or she for some strong and cogent reason is unfit or in-

competent to take charge of the children, or unless the welfare of the children themselves, for some special or extraordinary reason, demands a different disposition at the hands of the court. Cox v. Carapella, Mo.App., 246 S.W.2d 513. * * * Having raised the question of the fitness of petitioner to act as custodian as an affirmative defense, respondent had the burden of proof on the issue of fitness. Cox v. Carapella, supra; Williams v. Williams, 240 Mo.App. 336, 205 S.W.2d 949."

The standard by which we are to determine the fitness of the petitioner to have his children has previously been considered by this court. In Cox v. Carapella, Mo.App., 246 S.W.2d 513 at loc. cit. [3] page 516, this court pointed out that the policy of this state in that regard has been declared in several statutes where the effort is to *divest* the parent of custody of the child, and held that the same standard serves as the measure of fitness where a parent seeks by habeas corpus to *obtain* his or her child from strangers holding the child without sanction of judicial decree. Section 210.120, RSMo 1959, V.A.M.S. covers the situation where the effort is to suspend the rights of the parent or parents, and commit children to the guardianship of the Department of Public Health and Welfare of this state. Then the test is whether the child is " * * dependent upon the public for support, or in a state of habitual vagrancy or mendicity or is ill-treated, and his or her life, health or morals are endangered by continued cruel treatment, neglect, immorality or gross misconduct * * *." Section 211.441(2) RSMo 1959, V.A.M.S. provides the state may proceed to terminate parental rights under the juvenile code when it appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the petition there has been abandonment; or that the parents have " * * * willfully, substantially and continuously or repeatedly neglected the child and refused to give the child necessary care and protection * * *" or that the parents, being finan-

cially able, have willfully neglected to provide the child with the necessary subsistence, education or other care necessary for his health, morals or welfare or have neglected to pay for such subsistence, education or other care where legal custody is lodged with others; or where the parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs or repeated lewd and lascivious behavior found by the court to be seriously detrimental to the health, morals, or well-being of the child; or where the parents have been found to be incompetent under Chapter 475, RSMo 1959, V.A.M.S. Our statutes state that the consent of a parent to the adoption of his or her child by another is not required where, for a period of at least one year prior to the filing of the petition for adoption, the parent " * * * either willfully abandoned the child or willfully neglected to provide him with proper care and maintenance." § 453.-040, (4), RSMo 1959, V.A.M.S.

It follows that the ultimate question in the instant case is whether the respondents have borne the burden of proof that petitioner is unfit under one or more of the following considerations as taken from these statutes in that petitioner has (1) willfully abandoned these children or has willfully, substantially and continuously or repeatedly neglected them, or being financially able, has willfully neglected to provide these children with the necessary subsistence, education or other care necessary for their health, morals, or welfare, or has neglected to pay for such subsistence, education or other care while their legal custody was with their mother; and (2) whether the petitioner is unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs or by reason of repeated lewd and lascivious behavior that we find would be seriously detrimental to the health, morals or well-being of these children; and (3) whether the children, if placed in his custody, might become dependent upon the public for support, or in a state of habitual vagrancy or mendicity, or that the children would be ill-treated or their lives, health or morals would be endangered

by cruel treatment, neglect, immorality or gross misconduct, Cox v. Carapella, Mo. App., 246 S.W.2d, supra, at page 517.

 Applying the evidence in this case to these tests to determine the petitioner's fitness leads inexorably to the conclusion that the respondents have failed to carry their burden. As to most of the inquiries, such as debauchery, habitual use of intoxicating liquor or narcotic drugs, lewd and lascivious behavior as found in subparagraph (2) above, and as to cruel treatment, immorality or gross misconduct as found in (3) above, there is complete failure of evidence. As to the ability of this petitioner to prevent the children from becoming dependent upon the public for support and not in a state of habitual vagrancy or mendicity and the chance of their ill treatment or neglect by the petitioner if placed in his custody, as stated in (3) above, the evidence clearly and greatly preponderates in petitioner's favor. His income is sufficient to care for the children and his testimony indicates he intends to give these children proper schooling, religious instruction and that they will be cared for while he is at work. The evidence also shows that the petitioner never abandoned these children or that he willfully neglected to provide for them in the past. It is true he did not pay all of the support money awarded the deceased mother by the divorce decree, but it is equally apparent from this transcript that he was not in a position to do so until November, 1959. It should be remembered that eight months after that date the children's mother drowned and he has been in almost continuous litigation since that time seeking the custody of these children so he could support them. We cannot and do not condone petitioner's failure during this eight-month period to pay this support money but under the factual situation here presented we do not find this eight-month failure to be such as would authorize us to characterize petitioner as a person unfit to have custody of his children.

 Accordingly, the respondents having failed to bear their burden of proving the petitioner unfit, he is entitled to the custody of his children forthwith. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of the court. The petitioner is hereby granted the custody of his children forthwith.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.