MARY G. BADGER, Respondent, v. HERBERT E. BADGER, Appellant.

Kansas City Court of Appeals, June 14, 1920.

1. **CUSTODY OF CHILDREN: Father: Mother: Immoral Conduct: Evidence.** A husband and wife had three small children. One of them was afflicted with a disease so that the mother despaired of his life. She became so concerned for him that she became broken in health and a nervous wreck. The father cared for her attentively until an immoral woman was employed as housekeeper. He then left her with her father who employed a nurse and she became restored to health. She then sought to go to him with the children and he refused and offered a divorce at his expense. He then went to keeping house with this woman in charge. The mother brought an action in equity to obtain the custody of the children. It was *held* that the father had forfeited his right to their custody and it was given to the mother.

Badger v. Badger.

2. **CONSTITUTIONAL QUESTION: When Raised.** The constitutionality of a statute must be claimed at the earliest opportunity in the trial court. It is too late to raise such question on appeal.

3. **COURT OF EQUITY: Jurisdiction: Children: Parens Patriae: Custody: Immoral Father.** A court of equity stands as *parens patriae* to infant children and has jurisdiction, without the aid of a statute, to take the custody of infant children from the father who is morally unfit and give it to the mother, they being separated.

4. **JURISDICTION: Habeas Corpus: Custody: Infants.** The writ of *habeas corpus* will not be allowed to interfere with a court of equity which has assumed jurisdiction in the matter of the custody and care of infants.

5. **HABEAS CORPUS: Guardian: Illegal Restraint: Equity.** In *habeas corpus*, the court may inquire whether an infant is restrained of its liberty by not being in custody of its guardian. But whether its guardian, though it be the father, has forfeited his right to the custody and whether such custody should be taken from him and given to the mother is a question for a court of equity.

6. **HABEAS CORPUS: Illegal Restraint: Custody.** Courts by the writ of *habeas corpus* have determined the custody of infants, for the reason that if they are found to be illegally restrained by being in illegal custody, they must be protected and the court adjudging their illegal restraint must see that they are so protected by placing them in proper custody.

Appeal from Bates Circuit Court.—*Hon. J. A. Calvird,* Judge.

AFFIRMED.

*T. W. Silvers, Charles E. Southard* and *Watson, Gage & Ess* for respondent.

*W. N. Haynes, W. O. Jackson* and *John H. Lucas* for appellant.

ELLISON, P. J.—On the 26th of March, 1919, plaintiff filed a bill in equity in the circuit court of Bates county against her husband whereby she seeks a decree "for the care, custody, control and management" of their three minor children, and for maintenance and support for herself. She prevailed at the trial and defend-

ant appealed, as to the custody of the children. Support for herself seems not to have been pressed.

It appears that the parties were married in Greeley, Colorado, on the 8th of July, 1904, and that their parents lived there; that they have three children, two girls and one boy, the girls, Mary and Alice, twelve and ten years old respectively, and the boy Robert, eight years old. Robert became afflicted with what is called "diabetis insipidis." He suffered much and was a constant and exacting care to his mother. She despaired of his life and from the mental and physical strain to which she was put in watching over him, together with her other household duties, her strength weakened and her health broke. Physicians pronounced her affliction to be neuresthenia, commonly referred to as nervous prostration.

His business was that of a civil engineer and in the summer of 1915 he obtained employment at Storm Lake, Iowa. Plaintiff and the children followed. Her nervous condition not improving, still despondent over the deplorable condition of the little boy, they took him to Chicago to be placed in charge of specialists, but found no relief. Plaintiff herself was taken to a place in Des Moines, Iowa to a "Retreat," for "rest cure." Before this, one Ethel Colyer, who figures prominently in the case, had been employed by defendant to care for the children and she was left in charge of them while plaintiff was absent. During plaintiff's absence defendant's mother came on a visit from Greeley, and Mrs. Colyer left in a day or two. Some time afterwards his mother took Robert back to Greeley where he stayed with her; she was then a widow.

It appears from testimony in behalf of defendant, and it is doubtless true, that during the time he was at home with her she gave evidence of acute nervous derangement and became abnormal in her concern for the afflicted boy. There was evidence tending to show that she threatened the life of herself and boy. There is much evidence tending to show this, and that her condition was such, at times, to justify one in thinking it

inadvisable to leave her alone with the children. Though it should be stated that defendant did frequently absent himself for several days at a time.

At any rate, plaintiff needed rest from the care of the children and they were taken to defendant's mother in Greeley and she went to her father, Mr. Graham, and mother; he being a man of independent living and consequence, residing on a large farm not far away. Here, it is clear, all the evidence considered, she was practically abandoned by defendant and the trial court was justified in finding that he never intended to live with her and had conceived the idea of robbing her of her children and putting them under the tutelage- of Mrs. Colyer as "housekeeper."

Mr. Graham received his daughter in his home, in December, 1917, and employed a nurse for her who attended her with such solicitude, seeing that she took gradually increasing exercise in the open air, that she found herself practically well again, and we think the trial court justified in finding that her health was restored.

Defendant himself testified that she was of unsound mental condition and that he "turned her over to her parents in December, 1917, with the understanding they would care for her" and that, excepting thirty-five dollars, he never contributed thereto.

After her recovery she was anxious to bring the family together and prevailed upon him to come to see her at her father's in May, 1918, and endeavored to have him provide a home that she might take a mother's place with her children. He refused and told her he did not care for her, stating too that he did not think she was fully restored. He saw her again in July, 1918, when she besought him to consent that she might live with him and the children, but he refused. On her inquiry, he told her he intended to secure Mrs. Colyer to keep house and take care of the children.

It is evident that during all of this time he was contemplating installing Mrs. Colyer in his house to take

care of the children and that he was endeavoring to learn whether he could get a divorce. He asked plaintiff's father if he had heard her speak of a divorce and offered to defray the expenses if she would procure one. He likewise advised with an old time friend, a lawyer, who discouraged him by telling him he had no cause.

While plaintiff was at her father's and the children were at his mother's, in Colorado, he determined on living in Rich Hill, Missouri, and engaged Mrs. Colyer to go there and take charge of a house he had rented, and while on one of his trips to Colorado, when he refused to live with plaintiff, she asked him if he intended to take the children to Rich Hill and put them in the keeping of Mrs. Colyer. His answer, though equivocal, showed that he had such intention and plaintiff thereupon brought an action in Colorado for maintenance, support and custody of the children. Though served with notice he got the children out of the State, took them to Rich Hill and installed them in the house with Mrs. Colyer in charge as housekeeper.

The trial court found that Mrs. Colyer was not morally fit to have the care and superintendence of the children. It was shown by undisputed evidence, and is conceded, that in 1913, she stopped at the house of a Mrs. Gage with a man named Krumvide and stayed all night, occupying the same room and representing herself to be his wife. Defendant attempts to palliate this by saying that she was engaged to be married to Krumvide and calls it "an indiscretion." But the fact is he was a married man and that his wife obtained a divorce from him for adultery with this woman and that the supposed "engagement" has not been carried out since the divorce.

It was further shown in the testimony of defendant himself, that on a trip either going to, or returning from, Storm Lake, Iowa, he and Mrs. Colyer staid all night at a hotel in Kansas City occupying adjoining rooms connected by a bath room in common. And it also appeared on testimony elicited from defendant,

that his house at Rich Hill was so constructed that a person could go from his room to hers without passing through any other room. Mrs. Colyer was not called by defendant as a witness; and while defendant was testifying on cross-examination he was asked whether he made "any examination of her history up there?" (at Storm Lake). His response was that "I decline to answer" and the same response was made to the question whether he knew Krumvide.

We find the case of Wellesley v. Wellesley, 2 Bligh (N. S.) 124, bears strong resemblance, in principle, to the one before us. There the mother on her death bed committed her three children (a daughter and two sons) to her two maiden sisters, requesting that they not let the father get possession of them. Afterwards the father presented his petition claiming the custody of the children and that they be taken from their aunts. His claim was denied on the ground that he was unfit. In regard to his conduct towards his sons while at school it was shown that in one of his letters he advised them (italics not ours) to "Study hard but as soon as you have completed your tasks, go out, in all weathers, *and play hell and Tommy,* chase cats, dogs and women, old and young, but spare my game." In another letter, written to the tutor of the boys complaining of the interference of the mother, he said "there are certain things which ought to be let alone, a man and his children ought to be allowed to go to the devil their own way, if he pleases."

Wellesley had taken up illicit connection with a Mrs. Bligh and was coarse enough not to care that his wife knew it. The court said that to give the father the care and custody "of this little girl and her brothers, would be in fact, to deliver them over to this abandoned woman."

In view of the foregoing we think it clear that defendant's conduct towards plaintiff, made sick by distress over the condition of their child; his utter indifference towards her since shortly after he became ac-

quainted with Mrs. Colyer; his coarse determination to place the latter in charge of his three children, two of them girls at the age of twelve and ten years, leaves the proposition undebatable that he has forfeited his right to their custody. And it being shown that the mother's health is restored, that she is a woman of the highest moral ideals, with an exalted love for her children, and that she yearns for the opportunity to teach them the principles of a Christian life, we can discover no reason why she should not have their custody.

But there are several legal questions presented by defendant which must receive our consideration. In a recent legislative act (Laws 1913, p. 91) the rights of mothers over their children have been advanced to those of the father. Sections 5 and 6 of that act refer more directly to a case of the nature now under review. They read as follows:

"Sec. 5. The husband and wife living apart are entitled to an adjudication of the circuit court as to their powers, rights and duties in respect to the custody and control and of the services and learnings and of the management of the property of their unmarried minor children without any preference as between the said husband and wife, and neither the husband nor the wife has any right paramount to that of the other in respect of the custody and control or of the services and earnings or of the management of the property of their said unmarried minor children, any provision of law whatever, written or unwritten, to the contrary in any wise notwithstanding; and pending such adjudication the husband or wife who actually has the custody and control of their said unmarried minor children shall have the sole right to the custody and control and to the services and earnings and to the management of the property of their said unmarried minor children.

"Sec. 6. In all proceedings for divorce or other proceedings in which shall be involved the right to the custody and control of minor children or their services and earnings, or the management of their estates,

the rights of the parents shall be equal, and neither parent as such shall have any right paramount to that of the other parent, but in each case the court shall decide only as the best interests of the child itself may seem to require.''

Defendant attacks the constitutionality of that entire act on the ground that it violates section 28 of article 4 of the Constitution of the State wherein it is declared that ''No bill (except . . .) shall contain more than one subject, which shall be clearly expressed in its title.'' A question of the constitutionality of this statute was not raised in the trial court and appears for the first time in brief and argument on appeal. In the trial court, it was objected at the outset that plaintiff could not get on with her case as *habeas corpus* was her sole and only remedy, that her petition did not state a cause of action and that the trial court was without jurisdiction save by *habeas corpus*.

At the close of the case in the motion for new trial the following objection is found: ''Defendant says that the court erred in declaring that under the general equity practice in this State and the Session Acts of 1913, page 91, the court had any jurisdiction to determine this cause, and to award plaintiff the custody and control of said minor children; and that the conclusion of the court was without authority of law.''

The foregoing in no manner raised the constitutional question now invoked. And though raised here, not having been raised at the trial at the earliest opportunity, it cannot be brought in later. [Ross v. Grand Pants Co., 241 Mo. 296, 299; Scott v. Dickenson, 217 S. W. 279.]

But we have examined the case as if the statute had not been enacted. To start with we have the sanction of the Supreme Court to the statement that the State, standing in relation of *parens patriae,* may provide for the comfort and promote the well-being of children even as against the parents and that courts of equity even in the absence of a statute have exercised such jurisdiction from time immemorial. [State ex

rel. v. Tincher, 258 Mo. 1.] Such courts have always exercised such jurisdiction as the agency of the sovereign power, which with us, is the State. [Matter of Knowack, 158 N. Y. 482; in re Tierney, 112 N. Y. Supp. 1039; In re Stittgen, 110 Wis. 625; Bryan v. Bryan,. 34 Ala. 516, 521; State v. Grigsby, 38 Ark. 406.] Pomeroy in his work on Equity Jurisprudence, Vol. 3, sec. 1307, upholds the right of courts of equity in such cases, even as against the parent, but says that the jurisdiction "is a delicate one," and that, "it rests in the highest degree upon the enlightened discretion of the court, and will only be exercised when plainly demanded as the means of securing the infant's present and future well being." In a footnote to that section it is said that the mere fact "the *father's* conduct is even grossly immoral, even though he is living in adultery," if the children are not brought *into contact* with it, and are not subjected to the injurious influence of its example, is not sufficient ground for removing them from his custody."

In the most interesting and instructive case (Wellesley v. Wellesley, 2 Blight, N. S. 124) to which we referred above and which is cited by Judge WALKER in State ex rel. v. Tincher, and which found its way to the House of Lords, Lord REDESDALE stated the jurisdiction had been recognized "from time immemorial" and that he had traced it back one hundred and fifty years (and he was writing about one hundred years ago). By way of fortifying his position he asks: "Now upon what does Lord Somers, upon what does Lord Nottingham, upon what does Lord Hardwicke, upon what does every Chancellor who has been sitting on the bench, in the Court of Chancery since that time, place the jurisdiction? They all say, that it is a right which devolves to the Crown, as *parens patriæ,* and that it is the duty of the Crown to see that the child is properly taken care of."

But, in this connection, counsel for plaintiff say that there is no jurisdiction in chancery since a complete

remedy exists in *habeas corpus,* by the Statute, section 2510, Revised Statutes, 1909, first enacted in 1873 (Laws 1873, p. 53). To a similar suggestion, Lord MANNERS, who delivered a concurring opinion in the case just cited, said in confirmation of jurisdiction in equity that it was the habit of the Court of Kings Bench when a writ of *habeas corpus* was applied for by a father, for that court to first. enquire "whether they are the wards of the Court of Chancery, and whether there are any proceedings in that court respecting them." And "If the Court of Kings Bench finds there are such proceedings, it declines to grant the writ." In likeness to this our Supreme Court denied a writ of *habeas corpus* for an infant because a divorce suit was pending between the contending parents, in which tribunal the custody of the infant could be cared for. [In re Gladys Morgan, 117 Mo. 249.]

There is no complaint here of imprisonment, or of illegal restraint. The defendant father (with the mother)' has a right to the care and custody of these children, unless he has forfeited that right, and whether he has or not, is a question about which a court of equity has jurisdiction to enquire. [Buckley v. Perrine, 54 N. J. Eq. 285, 293.]

But besides the foregoing authorities including the Statute of 1913, there are others wherein it is definitely stated that a court of equity has jurisdiction in cases like this independent of the statute. [29 Cyc. 1602; Bryan v. Bryan, 34 Ala. 516, 521.] It seems clear that a mere right to *habeas corpus* in one parent against the other, as recognized by section 2510, Revised Statutes 1909, was not intended to withdraw the well-recognized jurisdiction of a court of equity over the persons, care and education of infants. Certain it is that *habeas corpus,* in many instances, would be an inappropriate proceeding for the settlement of the many troublesome and intricate questions which sometimes arise and that it would not afford an adequate remedy.

The foregoing considerations require an affirmance of the judgment. All concur.