256 S.W.2d 53 (1953)
STRICKLIN
v.
RICHTERS et al.
No. 7171.
Springfield Court of Appeals. Missouri.
March 20, 1953.
Granville L. Gamblin, St. Louis, for petitioner.
Haymes, Dickey & Dickey, Springfield, G. C. Beckham, Steelville, for respondents.
PER CURIAM.
Habeas Corpus. Our writ was issued, return made thereto and an answer to the return was filed. Extended hearings have been had and the evidence presented by depositions and testimony of witnesses appearing in person.
The petitioner, Rachel Mae Stricklin, is the mother of Linda Mae Richters, born June 27, 1948, and at this time nearly five years of age. The respondents, Adolph H. Richters and Edna Richters, are the paternal grandparents of Linda Mae. The facts show that on the 23rd day of September, 1946, the petitioner married Harry E. Richters, son of respondents. Linda Mae was born of this marriage. Petitioner and her husband separated April 15, 1951, and on July 23, 1951, Harry E. Richters filed a suit for divorce in the City Court of East St. Louis, Illinois. The only ground stated in his complaint was that of adultery. It was also alleged in the complaint that the child, Linda Mae Richters, was then in the custody of her paternal grandparents, by agreement of the parties, and the court was asked to approve such custody. The court was also asked to retain jurisdiction of the cause so it could change the custody should it become impossible for the paternal grandparents to further keep Linda Mae *54 and the parties were unable to agree as to her future custody.
On the same day the petition was filed, Rachel Mae Richters filed her entry of appearance, sworn to before a Notary Public, four days before the petition was filed, in which she waived service of process, consented to the entry of such orders as the court might see fit to make in the same manner as if she had been duly and regularly served. She further consented that the action for divorce could be heard without giving her "any notice of any kind," and on the same day on which the petition was filed if the plaintiff so desired. It was further stated in her entry of appearance that she was not a member of any of the United States Armed Forces.
On the same day that the petition and entry of appearance were filed, the cause was heard in the City Court of East St. Louis, Illinois, (Rachel Mae Richters not appearing) and in its decree, the court found that the plaintiff was a resident of the City of East St. Louis and had been a resident of St. Clair County, Illinois for three years last past before filing his complaint. It was then found that the parties had been lawfully married at Steelville, Missouri, September 23, 1946, and that plaintiff had properly conducted himself as a kind and indulgent husband, that Linda Mae Richters, age three at the time of the decree, was born of this marriage and was in the custody of her paternal grandparents, who were found to be fit and proper persons to have such custody and that they did have such custody by agreement of the parties. The court also found "that subsequent to the intermarriage, defendant has been guilty of several acts of adultery as charged in plaintiff's complaint." It was then adjudged and decreed that the bonds of matrimony be dissolved, that each of the parties was free from the obligations thereof, and that the court retained jurisdiction of the cause for the purpose of fixing the future care and custody of the child born to this marriage, should it become impossible for the paternal grandparents to continue their care and custody and the parties were unable to agree among themselves as to the future care and custody of Linda Mae.
The evidence shows that it had been explained to petitioner and that she knew that the only ground in the complaint for divorce was adultery, a copy of the decree was exhibited to her in which the court found her guilty as charged in the petition and she made no objection either to the charge in the complaint for divorce or in the decree of the court.
Harry E. Richters re-married within one week and the petitioner, Rachel Mae Richters (now Stricklin) re-married within six months after the decree was entered. Her new husband had been married at least once before and divorced and had a child by a former marriage, a boy twelve years of age. The petitioner, her husband and her stepchild are now living in St. Louis, Missouri, in a flat. Her present husband is a construction worker and at one time since their marriage, had been on a job in Rochester, Minnesota, which kept him away from St. Louis for approximately two months. His salary was about $85 per week. He offered to take Linda Mae into his home. The evidence further showed that on the 24th day of December, 1949, when Linda Mae Richters was about one and one-half years of age, that petitioner and her then husband, who were living in East Carondelet, Illinois, visited his parents, Adolph and Edna Richters at Steelville, Missouri, and when they were ready to leave, informed Mr. and Mrs. Richters that they intended to leave Linda Mae with them for a while as both of them intended to work in Illinois. They had said nothing about leaving her until they were ready to leave and Linda Mae's grandparents knew nothing about such intention until then and at that time nothing was said about it being a permanent arrangement. They did return to East Carondelet, leaving Linda Mae with her paternal grandparents. She has never resided with either of her natural parents since that time and as stated, is now nearly five years of age.
Adolph and Edna Richters, the paternal grandparents of Linda Mae are people of high moral standing and of sufficient wealth and income to give Linda Mae a good home. Her grandfather is honorably and permanently employed. The evidence as to the *55 good character of these grandparents was so overwhelming that there has been no effort in any way to disprove their fitness to act as custodians of their granddaughter. In fact, their fitness is conceded.
There was considerable evidence that at the time Linda Mae was delivered to her grandparents, that she was in an unhealthy and unkempt condition, her hair was matted with filth, her face, body and clothing were dirty and she was suffering from malnutrition and want of motherly care.
There was much evidence that the conduct of petitioner before and after Linda Mae was born was not exemplary, and that she was a poor housekeeper. On one occasion, at least, the evidence shows that she became very much intoxicated; that she frequented beer joints and taprooms, that she associated with people of questionable character, had male visitors at her home when her husband was away at work, in fact there was plenty of evidence before us, if believed, to justify the judgment of the City Court of East St. Louis that she had at times been guilty of acts of adultery. On occasional week end visits to see Linda Mae she had been drinking intoxicants. Some of this testimony relative to her conduct came from her ex-husband but his recitation of the alleged happenings was such as to make them sound unreasonable and unbelieveable.
Of one such occurrence, as recounted by him, it seems that during the period he was working nights for the Missouri Pacific Railway Company, in Illinois, he arrived home from his work one morning about 4 o'clock. Instead of retiring he took his gun and started on a restful stroll through the river bottoms and along the stream. He always liked to take his gun on these frequent, nocturnal and recreational excursions (after a hard night's work). He had proceeded toward the river about 300 feet from his house when, unexpectedly, he noticed an automobile suspiciously parked in the cornfield near a large and overshadowing tree. He does not say whether curiosity or an urge to prevent the perpetration of some illegal enterprise that might be afoot, caused him to investigate, but he did just that in fact. Keeping the tree between him and the automobile, he was able to approach, gun in hand, so close to the car that he could distinctly see and recognize the occupants, one of whom was his wife. She and her male companion (for such it was) appeared to be in an amorous mood, which, though perhaps not reprehensible under all circumstances, at all places and between all individuals, could hardly be looked upon in this setting by this observer without creating some suspicion and disfavor. He saw his wife, with apparent willingness, clutched in the passionate embrace of a voluptuary, whom he recognized as an acquaintance and former friend. For some reason, perhaps to relieve the nervous tension occasioned by such amorous exercises, the occupants of the motor vehicle would occasionally "break it up" long enough to take liberal potations from a bottle, that, in the observer's best judgment, and based only upon his view and personal knowledge of such matters, contained a delectable beverage commonly referred to as Bourbon. This conduct on the part of his wife and her paramour was quietly observed by him for a period of time and then he decided that he would, to classically express it, "Fold his tent like the Arab and as silently steal away." He says he left as stealthily as he had approached. They were too busy to know he had observed them and his unexplained failure to let them know, leads to the natural assumption that it was due to his longing for solitude and further time to reflect upon his observations and settle in his mind the question whether this conduct on the part of his wife was really reprehensible or would it meet the approval of such an eminent authority on human behavior as Emily Post.
His recitation of this occurrence, while enlightening and calculated to create rapt attention on the part of the court, did not, somehow, seem to include the natural and expected climax and thereby carry conviction of its truthfulness. In fairness, we add that it was denied in toto by his wife. But other testimony, from other sources cannot be as wholly disregarded.
At the time of the hearing before us, the petitioner and her ex-husband, Harry E. Richters, the paternal grandparents, Adolph and Edna Richters and their granddaughter, Linda Mae Richters, were all residents of *56 the State of Missouri. The Illinois Court had jurisdiction of the father and mother of Linda Mae and while Linda Mae was at that time temporarily in the custody of her grandparents, who lived at Steelville, Missouri, her domicile was that of her father in Illinois, Beckmann v. Beckmann, 358 Mo. 1029, 218 S.W.2d 566, 9 A.L.R.2d 428, and that court had jurisdiction of her person at that time.
Her domicile now established by her grandparents, is in Crawford County, Missouri and we have jurisdiction. Dawson v. Dawson, Mo.App., 241 S.W.2d 725; Daugherty v. Nelson, Mo.App., 234 S.W.2d 353.
In the hearings before this court, all parties were present, including the present husband of petitioner and Linda Mae. During the hearings, it was clearly apparent to this court that Linda Mae was very fond of her grandparents and they of her, she was well cared for and furthermore, as far as the court could observe, she had no affection for her natural mother and father and the court did not observe any display of affection by the father or mother for Linda Mae.
The welfare of the child is to be the first consideration of this court. Ex parte Schultz, 237 Mo.App. 1107, 180 S.W.2d 613; Ex parte De Castro, 238 Mo.App. 1011, 190 S.W.2d 949; Williams v. Williams, 240 Mo. App. 336, 205 S.W.2d 949.
We are fully aware that all things being equal, the natural parents of a child have a claim to its care and custody superior to that of grandparents or other relatives. Armstrong v. Armstrong, Mo.App., 185 S.W.2d 845; Cox v. Carapella, Mo. App., 246 S.W.2d 513.
Also, it is the law, that ordinarily, as between the mother and the father of a female child of tender years, it will be placed in the custody of its mother. Armstrong v. Armstrong, supra. There can be no question in this case but what Linda Mae is being well taken care of by her grandparents. She is receiving religious instruction, she is being well clothed and well fed, lives in a happy and Christian household under the most favorable circumstances and that her grandparents have sufficient wealth and income to take care of her in a way most beneficial to herself.
The evidence further shows in this case that the father recently filed a suit seeking to obtain the care and custody of Linda Mae. This was tried in the Circuit Court of Crawford County and his petition was dismissed and the change refused and by the judgment of the court it was found that Linda Mae's paternal grandparents were entitled to her care and custody. In this case would it be better for Linda Mae to be turned over to the care and custody of her mother? She was practically abandoned to her grandparents by her mother and father when she was a year and a half old. For more than three years her grandparents have taken the best of care of her and a strong affection has grown up between Linda Mae and her grandparents. To her natural parents, she is practically a stranger. So far as we could observe, Linda Mae displayed no affection for her mother but it was obvious that she loved her grandparents. This cannot be wondered at when we know from the evidence that since the Christmas Eve, 1949, when she was eighteen months of age and left with her grandparents, no effort was made on the part of petitioner to recover her, to support her or to look after her in a manner which a natural mother would have been inclined to do. We do not believe all the testimony relative to the petitioner's conduct from the time she and her then husband left Linda Mae with the grandparents until this petition was filed, but there is enough of what we think is credible evidence to convince us that the petitioner frequently visited beer joints, would become intoxicated, was, to say the least, rather liberal in her associations with men other than her husband, and she was so engrossed with other activities that her duties as a mother seem to have been practically forgotten, at least became secondary to her other interests. She re-married within six months of her divorce and asks us, after more than three years of absence, to send Linda Mae back to a home maintained by a step-father who also has a son of his own, by a former marriage, living in the same household. Such a decision would *57 disrupt her present happy existence and require her to re-adjust her mode of living in strange surroundings. She is of a nervous and delicate disposition and we do not believe would be benefitted, but rather harmed by such action. See Davis v. Davis, Mo. App., 254 S.W.2d 270. At most, such a change would be in the nature of an experiment and in such we should not indulge. Irvine v. Aust, Mo.App., 193 S.W.2d 336. Incidentally, this step-father is under no legal duty to support her. Hawkins v. Thompson, Mo.App., 210 S.W.2d 747. In re Stevens' Estate, Mo.App., 116 S.W.2d 527. It could be that if the mother were in complete control of the household, Linda Mae might be well cared for therein, but we think, under the evidence in this case, that her future would be subjected to a grave risk, if she were returned to the petitioner at this time, when we know beyond any question, she is now receiving all the kindness, love and attention that fond grandparents could give to an appreciative grandchild.
In arriving at this conclusion, while we consider all the other elements involved, we do not think the conditions have changed since the care and custody was awarded to the grandparents in such a way that the change would be beneficial to the future of Linda Mae.
The writ of habeas corpus should be quashed and Linda Mae Richters remanded to the custody of Adolph and Edna Richters. It is so ordered.