305 S.W.2d 713 (1957)
I----, Plaintiff-Respondent,
v.
B----, Defendant-Appellant.
I----, Plaintiff-Appellant,
v.
B----, Defendant-Respondent.
Nos. 7583, 7615.
Springfield Court of Appeals. Missouri.
October 11, 1957.
*714 Lincoln, Lincoln, Haseltine, Forehand & Springer, Springfield, for plaintiff.
Barbour & Patterson, Springfield, for defendant.
RUARK, Judge.
In Case Number 7583 we are again called upon to decide as to the custody of a child. Because the future of that child may be affected by public printed record of the unsavory conduct of a parent, names are omitted.
As to the background: The father, plaintiff below, and mother, defendant below, were married in this jurisdiction about 1948. After the marriage they lived next door to the paternal grandparents. A girl child was born (age seven at trial date), and it appears that the paternal grandparents almost immediately took over the principal care, custody, and upbringing of this child. She has been with these grandparents more than with the parents throughout her life and she now resides with such grandparents. In 1952 was born a son (about five years old at trial time) who is the subject of this controversy.
When this child was six weeks old, the parents moved to another state. The paternal grandparents went along (though in a separate automobile). The two families *715 established themselves in separate houses less than a mile apart in the same city.
In 1954 there was a separation apparently by agreement, the father (or the paternal grandparents) retaining care and custody of the little girl, and the mother taking the boy with her and returning to Missouri to live with her parents. Shortly after the mother left, the father sued for and obtained a divorce. Within a week after his decree was final he married another woman. This marriage lasted about three months and he and his second wife separated and were divorced. In the fall of 1955 the defendant mother took the little boy and went back to the father, and plaintiff and defendant were remarried. In April 1956, while the plaintiff father was at work, defendant "picked up and left" and again returned to Missouri, taking the little boy with her. This time she left without previous discussion or knowledge on the part of the plaintiff. He says she signed his name to a check, without his knowledge, in order to get plane fare to return. He discovered she had left upon coming in from work that evening and learned by calling the home of her parents that she and the boy were back with her parents in Missouri.
Within sixteen days the plaintiff filed another suit for divorce against defendant, and interlocutory decree was obtained. The petition in that case did not pray for care and custody of the boy because, as the father says he was informed by his counsel, the state of his residence had no jurisdiction to award custody of the child resident with the mother in Missouri.
Shortly after obtaining his interlocutory decree, the plaintiff brought this action by the filing of a petition entitled "Application for Custody of Child." In this he charged the defendant as an unfit and improper person to have custody of the boy because she neglects him, screams and yells at him, and is running around with numerous men. The petition then charged the defendant with one recent specific act of immorality which we will refer to later as the "hotel incident." The petition further charged her with having shown no love and affection for her daughter (not the child in controversy here). He asserted his own fitness to have custody and prayed for such.
The answer asserted that, as to the girl, the plaintiff's parents took charge of her care and upbringing shortly after her birth and have kept it. That they (the paternal grandparents) moved to the state where they now live, along with the parents, and continued to retain care, custody, and control of the girl at the new place of domicile, but they have never (nor has the plaintiff) manifested any interest in the second child, the boy here involved. That the defendant and the boy now live with her parents, where he has a good and loving home with satisfactory environment.
In trial of this cause, plaintiff testified that while the parties were still living together the defendant frequently used obscene language toward the boy and toward the paternal grandmother. This grandmother testified that defendant had used such language toward her on one occasion, over the telephone. Plaintiff also produced witnesses who testified that frequently (on Saturday nights) in the period after the last separation the defendant, in company with others, usually with one certain woman and usually with different soldiers, would come into a certain cafe at times after midnight. One witness expressed it as "after the bars had closed." On these occasions her woman companion would be drunk and would act unseemingly, sufficiently so as to annoy men who were customers in the cafe. That on these occasions defendant would frequently be drinking but that she would sit down and behave herself and was not "out of the way." One witness testified to having also seen defendant in bars on two or three occasions. Another witness who worked at an all-night cafe testified that at 4:00 in the morning of the day before the trial of the case the defendant came to the door of this cafe and wanted to know if "Jim" had been there. Defendant positively denied this occurrence.
*716 She testified that she was at such time working at another restaurant until 3:00 in the morning, but that the incident in regard to search for "Jim" did not occur.
Plaintiff also introduced a series of eight letters apparently written by two of defendant's acquaintances and addressed to her during a period extending from November 1955 to March 1956 (this after defendant had returned to her husband and prior to the last separation). Defendant admitted that she got the letters, that one of the writers was a friend with whom she corresponded, the other an acquaintance she had associated with "not much."[1] These letters indicate that a regular correspondence was continuing between the defendant and the writers. They refer to persons, places, and incidents in previous associations and recount some of the present doings of the writers. We do not wish to spread the content of these letters upon the printed page. Some of it is filthy. Suffice it to say that the principal refrain (in some of the letters) is soldiers and other servicemen, honky-tonks, liquor, and sexual relations. If they do not indicate loose moral habits on the part of the defendant, they at least attest to the fact that defendant had some dissolute friends and confidants and that at least one of them has morals on a par with those of an alley cat.
Plaintiff also called police officers to testify as to the "hotel incident." In order to avoid testimony in regard to the details of this incident, the defendant admitted for the record in substance the following facts: That within a month prior to the filing of the petition in this case the defendant (age twenty-eight) was caught by the police while resorting to rooms as husband and wife with a soldier from Fort Leonard Wood. This soldier was eighteen years old and of Puerto Rican descent. That defendant was arrested and that she thereafter forfeited her bond upon the charge against her made in this respect. By the admission of such incident defendant was able to keep out of evidence the details and circumstances surrounding such arrest and charge.
Plaintiff proved his good reputation in the locality of his Missouri residence for the period prior to his removal therefrom in 1952. He did not offer testimony concerning his reputation in the locality of his present residence. The defendant did not offer to prove good character on her part.
In respect to his plans and ability to care for the child, plaintiff testified that he is steadily employed and lives in a three-bedroom house with another man. He and this friend "batch" and prepare their own meals but have a maid who comes in to clean once a week. He leaves for work at a quarter until seven in the morning and his regular work hours end at 4:00 p. m. His parents' house is "on the way to work." He works to a later hour two or three times a week, but when he does not work late (he says) he gets his daughter from his parents' home and has her with him in his home in the evenings. We gather from his testimony that she eats all of her meals with his parents and spends most of the nights with them, but that the father has her with him on occasions which are convenient and compatible with his work. He stated that his present plan, if he secures custody of the son, is to have both children stay with him at night, take them to his parents' home before breakfast in the morning on his way to work, and leave the children with such parents during the day, then pick them up in the evening and take them home with him. He said his ultimate plan is eventually to move in with his parents, but the grandmother, who testified, gave no indication of any knowledge of this plan. These paternal grandparents are approximately fifty years of age. The paternal *717 grandfather is employed as a maintenance man in a mill. The paternal grandmother testified that she loved the boy; that she was willing to care for him and help with his rearing; that it was not her idea to take the child, but that she realized if her son got custody she would have to help in the child's upbringing, and this she would do. The reputation or willingness of the paternal grandfather is not shown. These paternal grandparents do not seem to have had close contact with the boy, as they have had with the daughter. This is about all the record contains concerning the paternal grandparents. The only thing we have which carries any indication concerning the character, home, and surroundings of these paternal grandparents is the fact that defendant has been willing for them to have the principal part in the care, custody, and rearing of her daughter.
The defendant testified, however that while the paternal grandparents showed considerable affection for the daughter, they never had been interested in and they had indicated no affection for the boy who is the subject of this controversy; that neither such grandparents nor the plaintiff father had ever paid any attention to him.
Turning now to the situation of the boy at present: The defendant mother and boy live with the maternal grandparents in a modest but adequate home. These grandparents are also approximately fifty years of age. They are shown to be persons of good moral character. The paternal grandmother concedes that they are "good people." The maternal grandfather is steadily employed. The maternal grandmother works two days a week. The defendant mother works at night in a cafe and contributes to the expense of maintaining the home. The maternal grandmother has the principal all-time care of the little boy. Living in the same locality is an aunt, the sister of the maternal grandfather. On the days when the maternal grandmother works, this aunt, or sister, keeps and cares for the child. Living with this aunt is her fifteen-year-old granddaughter (whose mother is deceased). This granddaughter helps in the care and amusement of the child, and there seems to be an affectionate older sister-younger brother relationship between the two. The child is well cared for and kept as neat and clean as a happy, healthy, robust, playing child of that age should be. Not only is the child well cared for physically, but the evidence convinces us that his moral and psychological needs are also well filled. The maternal grandparents, the aunt, and the fifteen-year-old cousin love him. The child has adequate playthings. He plays with other children in the neighborhood. The grandmother plays with him, and on his return from work in the afternoons the grandfather plays with him. Often the grandfather is the Indian who gets shot by the cowboy. The grandfather has bird dogs, and they play with the pups. The child attends Sunday school and, while it lasts in the summer, also attends Bible school. He is usually taken by the fifteen-year-old cousin. The boy is happy in attending these schools. Samples of the work done at such schools indicate both intelligence and interest on his part. All in all, it appears that the boy is happy, healthy, well cared for, and well adjusted in his present environment.
As to the relationship between the boy and his mother, the defendant here, the evidence leaves us with no doubt that there is a strong and trusting bond of affection and attachment between the two. When the mother leaves for work in the evening, the child occupies considerable time in telling her goodby and often cries upon her leaving. Plaintiff himself testified that he had seen the crying of the child upon occasions when the mother would leave. The mother plays with the child in the yard and occasionally takes him to parks and "western" movies. We think the affection of the mother is also indicated by the fact that she has been willing to face confrontal with her moral derelictions *718 (at least in respect to the hotel incident which was pleaded) in a fight to save the custody of her child.
On these facts the trial court awarded custody to the father.
Following the judgment, defendant filed a motion for new trial, setting up, among other things, newly discovered evidence, and the motion was accompanied by the affidavit of a woman who averred therein that during the trial of the case the paternal grandmother stayed in the home of a relative of the affiant and that she heard the paternal grandmother say on more than one occasion and in the presence of the plaintiff father that she, the paternal grandmother, did not want the child and didn't know what she would do with it if she got it. The affidavit further stated that the plaintiff father stayed in her home during the trial and that he told her he did not want to take the child but "just wanted to show them that he could." To this the plaintiff filed counter-affidavits from the father and paternal grandmother which denied making such statements. At the hearing on this motion the maker of the first affidavit above mentioned was sworn and testified. Her testimony supported her affidavit in regard to the remarks of the paternal grandmother, but in regard to the statements of the plaintiff it was that he wanted his child and he also wanted to show his ex-wife that he could get him. The court overruled the motion for new trial.
In reviewing this record we must and do hold that as of date this case was tried the mother was unfit to have custody of her child. In so finding we are not to be taken as holding that either past misconduct or isolated transgressions against the moral law necessarily unfit a person to have custody of his or her child. The contrary is true.[2] Nor, in a custody case, are we to sit in imperfect judgment of our brothers with a view of punishing them for their transgressions.[3] The sole purpose of our inquiry is to determine what is best for the welfare of the child. We human beings are subject to weaknesses and prone to mistakes, but that does not mean that the most of us are not the best fathers and mothers which nature and society can provide. A too strict and puritanical standard applied in judging our fitness might result in our children's having extremely proper upbringing according to a stern and unrelenting code, yet being denied the warmth and sunshine of love, affection, and a feeling of security in being wanted. Hence we venture that occasionally a "bad" person is a "good" parent. The test, therefore, is not whether the mother is good or bad, but how her character, conduct, surroundings, and outlook on life will affect the child.
In this case the mother does not attempt to show a good moral character. She admits registering in a hotel as husband and wife with a Puerto Rican soldier ten years her junior. Her associates are immoral and dissolute. The free hours she keeps are late. The places she frequents are not those we regard as having a wholesome atmosphere. Her personal devotions and activities can be summed up in the words soldiers, sex, and soirees. We do not doubt that she loves her child, but not enough to abandon the life she has been living so that he may not be shamed by her conduct. The composite picture of her activities, associates, and outlook on life is one of rather brazen unwholesomeness. The child is well cared for, it is true, but a large measure of the credit for that must go to her good and conscientious parents and the others of her kin. The choice then remaining is between awarding the custody *719 to the petitioning father or to the maternal grandparents, who have requested it.
It is a basic presumption of law that it is to the best interest of the child for it to be and remain in the custody of its natural parent.[4] The courts have given heed to and discussed this presumption in language ranging from strong to temperate. In some of the cases it is said that the presumption must be overcome by clear and cogent evidence of special and extraordinary reasons which manifestly demand that the custody should not remain with the parent. Others use the expressions "all things being equal" and "unless it appears by satisfactory evidence." We think the total language of the cases can be summarized by the statement that the natural parent's right to custody should not be denied unless it be shown that such parent is unfit, incompetent, or unable to care for the child, or unless the welfare of the child manifestly calls for a different disposition under the circumstances shown.[5] And it follows that whoever denies the fitness of the parent must prove it.[6]
The unfitness of the father has not been proved. True, his reputation and standing in the community where he now lives is not shown; and the fact of his marriage within approximately a week after his divorce, and his subsequent separation and divorce from the second wife within a period of ninety days, might be some indication of instability in regard to family affairs. But we cannot say that this marriage and divorce of and in itself marks him as unfit. However, it is one item to be considered in determining whether the welfare of the child manifestly requires a disposition other than in his custody.
Militating against the strong presumption in favor of the father's right is the reluctance of our courts, as "against the policy of the law," to award custody to a person when it appears that the child is to be taken out of the state and, to some practical extent, beyond the jurisdiction of the court.[7] This should be especially applicable when the child is to be taken and removed a far distance (as in this case) from contact with and visitation by others whom he loves and who are interested in his welfare. This reluctance, however, does not take the form of an insurmountable rule, and there are a number of cases in which such custody was ordered when it was considered to be for the best interests of the child.[8]
The paramount consideration, however, the umbrella which spreads over and shadows all other rules or presumptions, is the welfare and the well-being of the child. This needs no citation. It is stated in almost every case which concerns itself with child custody. The result is, therefore, that a court must weigh all the conflicting rules and presumptions together with all the facts *720 and circumstances of each particular case and determine where the best present and immediate future of the child lies.
In determining this question we must commence with the presumption previously stated that the child will be better off with his father. Also, the father's stated plan to unite the brother and sister deserves attention and commendation, for it is usually better that families be kept together. As against this we consider the father's statement of his plans to keep the children at home (where he "batches" with another man) at nights, get them up early in the morning and take them to his parents' home before breakfast, leave them, and call for them again in the evening after work. The arrangement may be necessary in his circumstances, and we cannot say that it is either impossible or completely impractical. Yet we can say that it will be difficult with children of that age, and a similar arrangement has been disapproved.[9] His circumstances, together with the history of the life of his daughter with the paternal grandparents, furnish some justification for the surmise that it will be these paternal grandparents who will have the principal part of the care and custody of the child, who will be the ones chiefly concerned with his washing, dressing, eating, playing, in fact, his everyday life; and about these grandparents our information is meager.
On the other hand, we know that the child is well kept, happy, and well adjusted in the home where he now lives. His grandparents are of good repute. They are interested in his welfare. They and others of their kin are seeing to his religious training. Other things being equal, it is better not to change the arrangements of a happy, well-adjusted child so as to subject him to a new routine and different standards of discipline,[10] especially where the transfer would be somewhat in the nature of an experiment.[11]
Yet a very serious factor enters the picture at the maternal grandparents' home, and that is the presence of the mother. There seems to be no indication that she has shown any disposition to change her way of life and conduct herself so as to be a good example for her son. According to the evidence which the trial court evidently believed (and to him we defer in regard to judgment of credibility of spoken testimony), she was out looking for "Jim" at 4:00 a. m. the day before the trial of this case. The evidence shows that the boy loves and is much attached to her. Consequently she will have a great deal of influence over him. The time is not too far distant when he cannot help knowing about her way of life and will realize the implications. The injury to him when this realization comes may be greater than the wrench to be caused by being now torn from the arms of those he loves.
Thus we find no solution not fraught with possibility of hurt to him, the innocent one.
In cases such as this we review the whole evidence and render such judgment as should have been rendered.[12] But the findings of the trial conrt, who saw the witnesses and heard their testimony, are not lightly to be disregarded, and they are usually permitted to stand unless in clear conflict with the preponderance of the evidence or disclose an abuse of discretion.[13] We *721 cannot say that its findings in this case conflict with the preponderance of the evidence or that it has abused its discretion in making the award of custody which it did. Admittedly it was and is a close and difficult question on the facts, but the decision was reasonably justified under the evidence presented and, with the exception of the question of visitation which we will mention later, we uphold the trial court's judgment on these facts.
Respecting claim of error in refusing to grant a new trial on account of newly discovered evidence: As a general rule the granting of a new trial for such reason is not favored and rests largely in the sound discretion of the trial court. Absent a clear abuse of this discretion, it will not be overridden by an appellate court.[14] We do not find a clear abuse of discretion in this case.
But we do believe that the trial judge overlooked the question of visitation. It is for the best interests of the child that he be not totally removed from contact with those with whom he has ties of affection. Furthermore, when the child is to be taken to a place far distant it is both salutary and of aid to the court in the exercise of its continuing jurisdiction that others besides the person in charge of such child have knowledge of the circumstances surrounding his care and upbringing.
The judgment should be modified, therefore, by granting permission of visitation at the home of the maternal grandparents for a period of thirty days during the summer months, the exact time to be fixed by the trial court as may appear to it to be most appropriate and convenient to the parties. The expense and responsibility for transporting the child to the maternal grandparents shall be that of the defendant, and the plaintiff shall bear the expense and responsibility for his safe return. The child, however, is not to be taken by the mother and kept away from the grandparents' home overnight unless she is accompanied by one of such grandparents or the aunt or cousin heretofore mentioned. The mother and members of her family shall also have reasonable visitation with the child in the state of the father's residence at all reasonable and convenient times and places, but subject also to the provision that the mother may not keep the child overnight unless accompanied by one of the relatives mentioned.
With the exception of the modification in regard to visitation, the judgment is affirmed and the case is remanded with directions to the trial court to make such appropriate orders as will accomplish and comply with what we have said in regard to the visitation.
On the question of suit money and attorney's fees in Case Number 7615:
The court allowed the defendant mother suit money and attorney's fees on appeal. From this order the plaintiff father has appealed. It is his position that the award of attorney's fees and suit money was unknown at common law; that the action is brought under Section 452.150 RS Mo 1949, V.A.M.S., which makes no provision for such allowance; also that, since the parents were divorced in a foreign state, the proceeding here was not one of continuing jurisdiction in regard to the children, and that the father was no longer under any duty to contribute to the mother.
Laying aside any question of whether the interlocutory decree relieved the father of all further obligation toward the wife,[15] it is beyond argument that such decree did *722 not divorce him from his minor children and the obligation to provide for them.
It is true that Section 452.150 does not expressly provide for the allowance of suit money, but it does not prohibit it. We are of the opinion that the action between father and mother in respect to custody of their minor children is not one born of the statuterather the statute is declaratory of the law which already existed in the equity courts. From the earliest times infants were regarded as entitled to the special protection of the king as parens patriae. This protection was exercised by, and has descended through, the chancery courts. Such protective jurisdiction is "broad, comprehensive, and plenary."[16] And this jurisdiction seizes and obtains once and when the child is brought before the court for any purpose and its welfare becomes involved. The child then becomes, in some measure, the ward of the court.[17] The effect of the statute is to recognize the law as it already existed and also to put the mother on equal footing in so far as preference in respect to custody is concerned.[18] The jurisdiction of the equity court, not being limited to the express provisions of a statute, is broad enough to accomplish that which is necessary to the purpose of making a correct determination in respect to the custody and welfare of a child with which it is concerned. Thus in the very recent case of McCoy v. Briegel, Mo.App., 305 S.W.2d 29, the court appointed an amicus curiae to render services in presenting evidence and examining witnesses on the question of the custody of a child, and awarded the amicus curiae compensation which was charged against the plaintiff.
We think that it is a discretionary power inherent in the court to require the petitioner to provide suit money in a custody case where the welfare of the child is at stake, especially where the petitioner is the father and legally liable for the support of such child. If this were not true, then in the case of an indigent mother the hearing might become a farce and the welfare of the child become subjugated to the wishes of the father. The purpose of the allowance is primarily for the protection of the child and the public, and if the power did not already exist in the equity courts public policy would require that it be brought into existence.
While we find no cases in this state which have been decided on the situation at hand, we do find an analogy in those which award suit money in separate maintenance actions. The statute (Section 452.130) does not provide for such allowance, but the courts have long held that it was a part of the necessarily inherent powers of a court of equity.[19] This inherent power to award suit money in a custody case has received recognition in at least a portion of our sister states.[20]
It is our conclusion that the court did not err in the allowance of attorney's fees and suit money pending appeal. However, on the taxing of any costs against the plaintiff *723 he should be credited with payments already made by him on any particular item of such costs.
The judgment is affirmed.
McDOWELL, P. J., and STONE, J., concur.
NOTES
[1] As to admissibility and extent these letters may be considered, see 32 C.J.S. Evidence § 703, p. 601; 20 Am.Jur., Evidence, § 958, p. 807, § 959, p. 809; Ex parte De Castro, 238 Mo.App. 1011, 190 S.W.2d 949, 952.
[2] Graves v. Wooden, Mo.App., 291 S.W.2d 665, 669; Johns v. McNabb, Mo., 247 S.W.2d 640, 643; Knepper v. Knepper, 139 Mo.App. 493, 122 S.W. 1117; see Ex parte Ferone, Mo.App., 267 S.W.2d 695; Jennings v. Jennings, 85 Mo.App. 290.
[3] Hachtel v. Hachtel, Mo.App., 291 S.W.2d 201; Perr v. Perr, Mo.App., 205 S.W.2d 909.
[4] Vance v. Vance, Mo.App., 203 S.W.2d 899; Abel v. Ingram, 223 Mo.App. 1087, 24 S.W.2d 1048; Ruedlinger v. Ruedlinger, 222 Mo.App. 819, 10 S.W.2d 324; Madigan v. Madigan, Mo.App., 260 S.W. 485; Tines v. Tines, Mo.App., 216 S.W. 563; State ex rel. Crockett v. Ellison, 271 Mo. 416, 196 S.W. 1140; Wilson v. Wilson, Mo.App., 260 S.W.2d 770, and cases cited; see, also, cases cited in note 5 following.
[5] McCoy v. Briegel, Mo.App., 305 S.W.2d 29; State v. Pogue, Mo.App., 282 S.W. 2d 582; Long v. Long, Mo.App., 280 S.W. 2d 690; Ex parte Ferone, Mo.App., 267 S.W.2d 695; Swan v. Swan, Mo.App., 262 S.W.2d 312; Stricklin v. Richters, Mo.App., 256 S.W.2d 53; Weir v. Marley, 99 Mo. 484, 12 S.W. 798, 6 L.R.A. 672.
[6] State v. Pogue, Mo.App., 282 S.W.2d 582; Williams v. Williams, 240 Mo.App. 336, 205 S.W.2d 949.
[7] Ackermann v. Ackermann, Mo.App., 280 S.W.2d 425; Brake v. Brake, Mo.App., 244 S.W.2d 786, 789-790, and cases cited; Jennings v. Jennings, 85 Mo.App. 290.
[8] Graves v. Wooden, Mo.App., 291 S.W.2d 665, and cases cited at loc. cit. 670; Hartman v. Hartman, Mo.App., 277 S.W. 950; In re Krauthoff, 191 Mo.App. 149, 177 S.W. 1112.
[9] See Perr v. Perr, Mo.App., 205 S.W.2d 909, 912-913.
[10] McCoy v. Briegel, Mo.App., 305 S.W. 2d 29; Stricklin v. Richters, Mo.App., 256 S.W.2d 53, 57; Irvine v. Aust, Mo. App., 193 S.W.2d 336, 342.
[11] Davis v. Davis, Mo.App., 254 S.W.2d 270, 275; Ruedlinger v. Ruedlinger, 222 Mo.App. 819, 10 S.W.2d 324, 326; In re Blackburn, 41 Mo.App. 622, 634.
[12] Graves v. Wooden, Mo.App., 291 S.W. 2d 665; Hachtel v. Hachtel, Mo.App., 291 S.W.2d 201; Long v. Long, Mo.App., 280 S.W.2d 690.
[13] Edwards v. Edwards, Mo.App., 302 S.W. 2d 37; Davis v. Davis, Mo.App., 254 S.W. 2d 270; Brake v. Brake, Mo.App., 244 S.W.2d 786; Smith v. Smith, Mo.App., 231 S.W.2d 637.
[14] Deacon v. City of Ladue, Mo.App., 294 S.W.2d 616, and cases cited at loc. cit. 626; McAdams v. McAdams, Mo.App., 267 S.W. 428; Hayes v. Adams, 241 Mo.App. 560, 244 S.W.2d 123, 127.
[15] See 27 C.J.S. Divorce § 161, p. 787 et seq.; Campbell v. Campbell, 107 Cal.App. 2d 732, 238 P.2d 81; Babcock v. Babcock, 63 Cal.App.2d 94, 146 P.2d 279.
[16] 27 Am.Jur., Infants, § 101, p. 822, § 105, p. 827; Ex parte Badger, 286 Mo. 139, 226 S.W. 936, 938-939; State ex rel. Cave v. Tincher, 258 Mo. 1, 166 S.W. 1028, 1030; see Pomeroy's Equity Jurisprudence, 4th Ed., vol. 3, § 1304, p. 3140; see cases cited in notes 17 and 18 following.
[17] Morrison v. State, Mo.App., 252 S.W.2d 97; Fawkes v. Fawkes, Mo.App., 204 S.W.2d 132, 140.
[18] Tomlinson v. French Institute of Notre Dame De Sion. 232 Mo.App. 597, 109 S.W.2d 73, 76; Badger v. Badger, 204 Mo.App. 252, 224 S.W. 41, and cases cited at loc. cit. 44; In re Krauthoff, 191 Mo.App. 149, 177 S.W. 1112, 1118; compare Ex parte De Castro, 238 Mo. App. 1011, 190 S.W.2d 949, 952.
[19] Meredith v. Meredith, Mo.App., 151 S.W.2d 536, and cases cited at loc. cit. 539; see, also Klepper v. Klepper, 193 Mo.App. 46, 180 S.W. 461.
[20] See McDonald v. McDonald, 124 Mont. 26, 218 P.2d 929, 15 A.L.R.2d 1260, 1265, and annotations at page 1272.